**Opinion issued March 31, 2022**



In The

# Court of Appeals

**For The**

# First District of Texas

———————————————

**NO. 01-20-00231-CV**

———————————————

**EDWARD SCHAFMAN, Appellant**

**V.**

**SUE SCHAFMAN, Appellee**

---

**On Appeal from the 309th District Court**
**Harris County, Texas**
**Trial Court Case No. 2018-21739**

---

## MEMORANDUM OPINION

Appellant Edward Schafman ("Ed") and appellee Sue Schafman both filed

petitions for divorce and sought the dissolution of their marriage. After a bench trial,

the trial court granted Sue a divorce and made a finding that Ed had engaged in cruel

treatment. The trial court divided the parties' marital estate and awarded spousal maintenance to Sue for eight years.

In three issues, Ed contends that the trial court abused its discretion by (1) awarding spousal maintenance to Sue because she possessed sufficient property to provide for her minimum reasonable needs, she does not have an incapacitating mental disability that prevents her from earning sufficient income, and she did not present evidence demonstrating that she had used due diligence in earning income or acquiring the necessary skills to earn income; (2) awarding $3,333.33 per month in maintenance to Sue for eight years; and (3) finding that Ed committed cruel treatment. We affirm.

**Background**

Ed and Sue married in December 1988. They have a son and a daughter, who are both adults. Ed is a certified public accountant and owns his own accounting firm in Bellaire. Sue worked briefly in an administrative position near the beginning of the parties' marriage, but when their son was born in the early 1990s, the parties agreed that she would be a stay-at-home mother and homemaker. Sue also had experience working in a hotel and in a restaurant before she married Ed.

During the parties' marriage, Sue struggled with alcohol abuse. She sought treatment from several rehabilitation facilities and attained sobriety in 2007. She was prescribed a muscle relaxant and medication for anxiety, and she continued to take

these medications through the time of trial. Sue also began taking Adderall for ADHD around 2016.

Sue is a native of Thailand, and her father owned a business and multiple properties in that country. Sue's father passed away around 2009 or 2010, and Sue was appointed executor of the estate. Due to complications created by Sue's stepmother, the probate of the estate took numerous years and had not completed at the time of the parties' divorce. Sue's presence was often required in Thailand when properties needed to be sold or court hearings were held.

Ed and Sue's relationship deteriorated over the years. Ed testified that around 2014, Sue moved out of their bedroom and began staying in their adult son's former bedroom. Sue's cooking and cleaning of the house became "sporadic." Sue also frequently traveled to Thailand during tax season, which placed pressure on Ed, who was extremely busy as an accountant during this time.

Sue, on the other hand, testified that Ed was mentally and emotionally abusive to her. She stated that in the two to three years prior to the divorce, arguments between them increased in frequency and Ed would insult and manipulate her. Although Ed would not call Sue names, he would tell Sue that she "would not make it without him," that he's the one who makes the money and puts food on the table, that she's "just not good enough," that she "forgot where [she] came from," and that she's greedy and ungrateful. Ed also accused Sue of stealing from him.

Sue traveled to Thailand in November 2017 and stayed there for five months, until April 2018. Almost immediately after she arrived in Thailand, Ed emailed her and stated that he planned to file for divorce.

Ed filed for divorce in April 2018 and alleged that the marriage had become insupportable. He requested reimbursement, alleging that community funds had been expended for the benefit of Sue's separate estate. Sue later filed a counterpetition for divorce and alleged as grounds for divorce that the marriage had become insupportable and that Ed was guilty of cruel treatment toward her. Sue requested that the trial court award her a disproportionate amount of the community estate and post-divorce spousal maintenance.

Over Memorial Day weekend in May 2018, Sue and Ed had an altercation at their house that led to the police being called. Sue had begun experiencing delusions, and she believed that Ed was trying to poison her and that he had installed cameras around their house to watch her. Ed had been in Austin with their daughter. When Ed returned to the house, he discovered that Sue had removed lights, smoke detectors, and outlets from the ceiling and walls of the house to search for cameras. She also unplugged appliances and turned off the power. Ed and Sue then had an argument over Sue's purse that turned physical. Ed testified that Sue scratched his arm, and Sue testified that Ed punched her in the knee.

Police officers arrested Sue, and she spent two days in jail before being released to a behavioral health center for emergency detention and observation. At this center, Sue was diagnosed with "Bipolar I Disorder, most recent episode manic with psychosis." By the time of her discharge from this facility, doctors had diagnosed her with delusional disorder. Sue was at this facility for a little over a week before she agreed to six weeks of voluntary inpatient treatment at the Menninger Clinic in Houston.

Sue's decision to obtain treatment at Menninger was contentious, primarily due to the cost of the treatment program, which totaled over $100,000. The trial court signed temporary orders in July 2018 requiring Ed to pay for the cost of treatment. While at Menninger, Sue was diagnosed with "unspecified schizophrenia spectrum and other psychotic disorder," "delusional disorder," and "other specified anxiety."

At the end of July 2018, Sue was discharged from inpatient treatment at Menninger. She moved into an apartment and began participating in the Menninger 360 outpatient program, which is designed to provide mental health services and aid in independent living. During the Menninger 360 program, Sue worked with a team of professionals who assisted her with setting up her apartment, creating a budget, taking medications, scheduling and attending doctor's appointments, and providing therapy. Sue participated in this program until the end of August 2018, when she had

to discontinue services because she could no longer pay for the services herself and Ed refused to pay.

Throughout the pendency of the divorce proceedings, Sue continued to struggle with her mental health and sobriety. She saw a psychiatrist on a few occasions beginning in September 2018, but she did not go regularly because the appointments were expensive. Sue admitted that she began drinking again in December 2018. She also acknowledged that she has used Adderall during the pendency of the proceedings, but she testified that she was "off of it" at the time of trial. She checked herself into a rehabilitation facility in April 2019 and again in September 2019, during a break in the trial proceedings. Sue was also involuntarily committed to a psychiatric facility in June 2019 after one of her neighbors, a police officer who was aware of Sue's mental health history, became concerned about her behavior and believed she was having a delusional episode.

After a bench trial that spanned three days in August and September 2019, the trial court signed a decree dissolving the parties' marriage, dividing their marital assets, and awarding spousal maintenance. The trial court granted Sue a divorce from Ed and dissolved the marriage "on the ground of cruelty." The property awarded to Ed included 100% of his membership interest in his accounting firm, the real property on which his office was located, an ownership interest in several different entities, three life insurance policies, several bank accounts, and the marital

residence, which was subject to an owelty of partition and equalization judgment in favor of Sue upon Ed's sale of the residence.[1] The divorce decree did not order Ed to sell the marital residence.

The divorce decree confirmed, as Sue's separate property, a Thai bank account containing proceeds from her father's estate, but the decree did not specify a value for this account. The court also awarded Sue property that included a condominium in New Braunfels, two bank accounts, funds in the trust accounts for the parties' lawyers after paying the parties' trial-level attorney's fees, four retirement accounts in Ed's name that had a total value of more than $680,000, and an equalization judgment for $254,690.41—representing approximately 30% of the fair market value of the marital residence—payable to Sue upon Ed's sale of the marital residence. The court also decreed that Sue was eligible for spousal maintenance and ordered Ed to pay her $3,333.33 per month from November 2019 through October 2027, or for a total of eight years.

---

[1] "[O]welty is the difference in value that results when a court divides property into shares of unequal value in partition proceedings." *Rodriguez v. Rivas*, 573 S.W.3d 447, 453 (Tex. App.—Amarillo 2019, no pet.) (citing *Sayers v. Pyland*, 161 S.W.2d 769, 772 (Tex. 1942)). The Texas Constitution protects a party's homestead from forced sale for the payment of all debts with several exceptions, including "an owelty of partition imposed against the entirety of the property by a court order or by a written agreement of the parties to the partition, including a debt of one spouse in favor of the other spouse resulting from a division or an award of a family homestead in a divorce proceeding." TEX. CONST. art. XVI, § 50(a)(3).

At Ed's request, the trial court entered findings of fact and conclusions of law. The court made numerous findings relevant to the spousal maintenance determination, including findings that Sue's medical records "conclusively demonstrated" that she had received "consistent diagnosis for mental illness" at multiple institutions, she would benefit from further treatment, she is not capable of full-time employment, and her reasonable monthly expenses and needs are not met by the division of the marital estate. The court expressly found that Sue was a credible witness and that portions of Ed's testimony were not credible. The court also recited that it relied on documentary evidence proffered by Sue in determining the value of the parties' property.

The court concluded that Sue lacked sufficient property to provide for her minimum reasonable needs and that she had a mental disability which prevented her from earning sufficient income to provide for her reasonable needs. The court also credited Sue's testimony that Ed was physically and verbally abusive to her and "subjected her to economic deprivation." The court concluded that sufficient evidence supported its finding that Ed was guilty of cruel treatment toward Sue.

Ed requested that the trial court sign additional and amended findings of fact and conclusions of law, and he proposed forty-three additional findings and seven additional conclusions. He also requested that the trial court amend several of its

findings and conclusions. The trial court did not file amended or additional findings of fact and conclusions of law. Ed appealed the trial court's divorce decree.

## Standard of Review

In family law cases in which the appellate standard of review is abuse of discretion, such as this case, legal and factual sufficiency of the evidence are not independent grounds for asserting error but are instead relevant factors in assessing whether the trial court abused its discretion. *Syed v. Masihuddin*, 521 S.W.3d 840, 847 (Tex. App.—Houston [1st Dist.] 2017, no pet.). In determining whether an abuse of discretion exists because the evidence is legally or factually insufficient to support the trial court's decision, we consider whether the trial court had sufficient information upon which to exercise its discretion and whether it erred in its application of that discretion. *Id.* Answering the first question involves the traditional sufficiency of evidence review, and answering the second question involves determining whether the trial court made a reasonable decision. *Id.* at 847–48.

When conducting a legal sufficiency review, we review the evidence in a light favorable to the finding, crediting favorable evidence if a reasonable factfinder could do so and disregarding contrary evidence unless a reasonable factfinder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *Syed*, 521 S.W.3d at 847 n.4. If the evidence would enable reasonable and fair-minded people to differ in their

conclusions, then the factfinder must be allowed to decide. *Syed*, 521 S.W.3d at 847 n.4; *see City of Keller*, 168 S.W.3d at 827 ("The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review."). As long as the evidence falls within the zone of reasonable disagreement, we may not substitute our judgment for that of the factfinder. *Syed*, 521 S.W.3d at 847 n.4.

When conducting a factual sufficiency review, we consider and weigh all the evidence. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam). We set aside the verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Id.*

The ultimate test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles, that is, whether the court's act was arbitrary or unreasonable. *Syed*, 521 S.W.3d at 847. The factfinder is the only judge of witness credibility and testimonial weight. *Willis v. Willis*, 533 S.W.3d 547, 556 (Tex. App.—Houston [14th Dist.] 2017, no pet.). When the testimony of witnesses is conflicting, we will not disturb the credibility determinations made by the factfinder, and we presume that the factfinder resolved any conflicts in favor of the verdict. *Syed*, 521 S.W.3d at 848.

**Spousal Maintenance**

In his first issue, Ed challenges the trial court's award of spousal maintenance to Sue. Ed first argues that Sue is not eligible for maintenance because, upon dissolution of the marriage, Sue possesses sufficient property to provide for her minimum reasonable needs. Ed further argues that the record does not support a finding that Sue has an incapacitating mental disability that prevents her from earning sufficient income. He also argues that Sue presented no evidence establishing that she had been diligent in earning sufficient income or in developing the skills necessary to do so during the divorce proceedings.

In his second issue, Ed contends that if we conclude that the trial court properly determined that Sue was eligible for maintenance, the court nevertheless erred in requiring him to pay $3,333.33 per month to Sue for eight years.

*A.    Governing Law*

Family Code Chapter 8 governs the award of spousal maintenance in a divorce decree. *See* TEX. FAM. CODE §§ 8.001–.359; *Dalton v. Dalton*, 551 S.W.3d 126, 130 (Tex. 2018) ("In 1995, the Texas Legislature first authorized courts to award a form of involuntary post-divorce alimony referred to as 'spousal maintenance.'"). The Family Code defines "maintenance" as "an award in a suit for dissolution of a marriage of periodic payments from the future income of one spouse for the support of the other spouse." TEX. FAM. CODE § 8.001(1).

11

Spousal maintenance is allowed "only under 'very narrow' and 'very limited circumstances.'" *Dalton*, 551 S.W.3d at 130 (quoting *McCollough v. McCollough*, 212 S.W.3d 638, 645 (Tex. App.—Austin 2006, no pet.), and *Cardwell v. Sicola-Cardwell*, 978 S.W.2d 722, 724 n.1 (Tex. App.—Austin 1998, pet. denied)); *O'Carolan v. Hopper*, 71 S.W.3d 529, 533 (Tex. App.—Austin 2002, no pet.) (stating that purpose of maintenance is "to provide temporary and rehabilitative support for a spouse whose ability for self-support is lacking or has deteriorated over time while engaged in homemaking activities and whose capital assets are insufficient to provide support"). The trial court may order maintenance only if the spouse seeking maintenance will lack sufficient property, including separate property, on dissolution of the marriage to provide for the spouse's minimum reasonable needs and the spouse:

    (A)    is unable to earn sufficient income to provide for the spouse's minimum reasonable needs because of an incapacitating physical or mental disability;

    (B)    has been married to the other spouse for 10 years or longer and lacks the ability to earn sufficient income to provide for the spouse's minimum reasonable needs; or

    (C)    is the custodian of a child of the marriage of any age who requires substantial care and personal supervision because of a physical or mental disability that prevents the spouse from earning sufficient income to provide for the spouse's minimum reasonable needs.

TEX. FAM. CODE § 8.051(2); *Cooper v. Cooper*, 176 S.W.3d 62, 65 (Tex. App.—Houston [1st Dist.] 2004, no pet.) ("To be eligible for spousal maintenance, appellee

12

must first have shown she lacked sufficient property to provide for her minimum reasonable needs.").

We review a trial court's award of maintenance for an abuse of discretion. *Fuentes v. Zaragoza*, 555 S.W.3d 141, 171 (Tex. App.—Houston [1st Dist.] 2018, no pet.); *Roberts v. Roberts*, 531 S.W.3d 224, 227 (Tex. App.—San Antonio 2017, pet. denied) ("Absent a clear abuse of discretion, we do not disturb the trial court's decision to award spousal maintenance."). The trial court does not abuse its discretion if there is some evidence of a substantive and probative character to support the decision or if reasonable minds could differ as to the result. *Amos v. Amos*, 79 S.W.3d 747, 749 (Tex. App.—Corpus Christi–Edinburg 2002, no pet.); *Limbaugh v. Limbaugh*, 71 S.W.3d 1, 14 (Tex. App.—Waco 2002, no pet.) ("If the record contains some evidence supporting these findings [regarding maintenance], no abuse of discretion is shown.").

## B. *Sue's Eligibility for Maintenance*

### 1. Sufficient property on dissolution of marriage

The trial court may order maintenance "only if the spouse seeking maintenance will lack sufficient property, including the spouse's separate property, on dissolution of the marriage to provide for the spouse's minimum reasonable needs." TEX. FAM. CODE § 8.051; *Day v. Day*, 452 S.W.3d 430, 433 (Tex. App.—Houston [1st Dist.] 2014, pet. denied). The Family Code does not define "minimum

13

reasonable needs." *Slicker v. Slicker*, 464 S.W.3d 850, 860 (Tex. App.—Dallas 2015, no pet.); *Cooper*, 176 S.W.3d at 64. Determining the "minimum reasonable needs" for a particular individual is a fact-specific determination to be made on a case-by-case basis. *In re Marriage of McCoy*, 567 S.W.3d 426, 429 (Tex. App.—Texarkana 2018, no pet.); *Cooper*, 176 S.W.3d at 64; *Amos*, 79 S.W.3d at 749. We consider the spouse's eligibility for maintenance at the time of divorce, not whether the spouse will be able to provide for her minimum reasonable needs at some point in the future with additional education or training. *Slicker*, 464 S.W.3d at 863; *Day*, 452 S.W.3d at 434.

In determining whether the spouse seeking maintenance will have sufficient assets after the divorce to provide for her minimum reasonable needs, the trial court may consider the liquidity of the assets awarded and their ability to produce income. *Benoit v. Benoit*, No. 01-15-00023-CV, 2015 WL 9311401, at *11 (Tex. App.—Houston [1st Dist.] Dec. 22, 2015, no pet.) (mem. op.); *Everitt v. Everitt*, No. 01-11-00031-CV, 2012 WL 3776343, at *8 (Tex. App.—Houston [1st Dist.] Aug. 31, 2012, no pet.) (mem. op.). When considering the assets awarded in a divorce, the law does not require the spouse to spend down long-term assets, liquidate all available assets, or incur new debt simply to obtain job skills and meet short-term needs. *Benoit*, 2015 WL 9311401, at *11; *Everitt*, 2012 WL 3776343, at *8; *Dunaway v. Dunaway*, No. 14-06-01042-CV, 2007 WL 3342020, at *3 (Tex. App.—

14

Houston [14th Dist.] Nov. 13, 2007, no pet.) (mem. op.). Courts have upheld a maintenance award "in situations where the spouse receiving the maintenance obtained substantial property in the divorce proceeding when those capital assets provided insufficient support." *In re Marriage of McFarland*, 176 S.W.3d 650, 658 (Tex. App.—Texarkana 2005, no pet.).

With respect to assets in retirement accounts, several courts have noted that these funds are not necessarily liquid due the possibility of penalties and tax consequences arising from withdrawal of the funds. *See id.* 659 (noting, in upholding trial court's award of maintenance, that primary asset awarded to wife was retirement account "which is subject to significant taxes for early withdrawal" and "[t]o generate any immediately accessible income from this fund would impose the significant early withdrawal tax consequences"); *Amos*, 79 S.W.3d at 749–51 (reciting trial court's finding that assets available to wife were not sufficient to meet her needs due to "the heavy penalties, interest and taxes associated with the withdrawal and use of funds" and holding that trial court did not abuse its discretion in awarding maintenance to wife); *see also Alaghehband v. Abolbaghaei*, No. 03-02-00445-CV, 2003 WL 1986777, at *5 n.1 (Tex. App.—Austin May 1, 2003, no pet.) (mem. op.) (stating, in upholding award of maintenance, that "[s]everal of the assets awarded to appellee are retirement accounts, and the tax consequences and

15

long-term financial consequences of early withdrawals render the liquidity of such assets problematic").

### a.      Trial court's findings and supporting evidence

Here, in the divorce decree, the trial court awarded maintenance to Sue, ordering Ed to pay $3,333.33 per month from November 2019 through October 2027, or a period of eight years. In its findings of fact and conclusions of law, the court found that Sue's "reasonable monthly expenses and medical needs are not met by the division of the community estate" and that Sue "lacked sufficient property, including her separate property, in order to provide for her minimum reasonable needs." In its conclusions of law, the court cited *Dunaway* for the proposition that "the law does not require a spouse to spend down long-term assets, liquidate all available assets, or incur new debt simply to obtain job skills and meet needs in the short term." The court concluded that Sue met the eligibility requirements for maintenance.

On appeal, Ed argues that the trial court erred in concluding that Sue was entitled to maintenance in part because she was awarded sufficient assets in the divorce decree to provide for her minimum reasonable needs. The trial court did not make an explicit finding on Sue's minimum reasonable needs, but it admitted Sue's Financial Information Statement, which claimed that Sue's total monthly expenses were $5,800. These expenses did not include homeowner's maintenance fees, car

payments, car insurance payments, cell phone payments, or monthly credit card payments,[2] all of which were listed as "Paid for by Husband." Additionally, although Sue allocated $500 per month for "Doctor/Dentist/etc.," her information sheet did not indicate whether this amount was meant to cover the cost of any needed rehabilitation programs or outpatient mental health treatment, or whether those were additional expenses.[3] Ed does not argue that any of the expenses listed on Sue's Financial Information Sheet were not necessary; instead, he argues that Sue was awarded sufficient property in the divorce to meet these needs.

The trial court awarded Sue a condominium in New Braunfels, valued at $269,500. Ed testified that this property is not encumbered by a mortgage and that it costs roughly $825 per month in property taxes, homeowner's association fees, and utilities. Sue acknowledged that it would "be free" to live in the condo, but she did not want to move there, nor did she want to sell it to pay for a new house. Although the court did not award Sue an interest in the parties' marital residence in Bellaire, the court placed an owelty on the property and awarded her a $254,690.14 equalization judgment—worth 30% of the fair market value of the property—to be

---

[2]   In the divorce decree, the trial court allocated the outstanding balances on two credit cards to Sue. One credit card had an outstanding balance of $11,063.85, and the other a balance of $24,256.27, for a total liability of $35,320.12.

[3]   At trial, Sue expressed concerned about her future medical needs and expenses, stating, "I'm just concerned about my medical insurance and being in the hospital . . . . There's no telling what's going to happen to me."

17

realized upon Ed's sale of the property. The court decreed that this judgment would be payable "upon sale of the property by Edward Schafman," but it did not order Ed to sell the property by a specific time.

The trial court also awarded Sue two bank accounts—containing approximately $4,300—and, following payment of outstanding attorney's fees, the funds in two trust accounts maintained by each party's attorney and containing proceeds from the sale of a piece of property during the pendency of the divorce proceedings. Evidence at trial reflected that the trust account maintained by Sue's attorney contained $86,554.59 and Sue's outstanding attorney's fees were $2,580. The trust account maintained by Ed's attorney contained $167,000, and Ed's outstanding attorney's fees were $35,815.17. After the outstanding attorney's fees were paid, approximately $215,000 remained in the attorneys' trust accounts, and this amount was awarded to Sue.

The trial court also confirmed, as Sue's separate property, funds in a Thailand bank account, representing proceeds from her father's estate. Conflicting evidence was presented at trial concerning the amount contained in this account. Ed testified that he had never seen any documentation concerning this account. Sue's proposed property division stated that this account held $23,023.56 as of October 18, 2018. The trial court admitted a screenshot purportedly of the account that represented the balance was $18,729.59 on May 15, 2019. Sue testified that she had transferred

funds out of that account, paid some funds to her brother upon his request, and estimated that "right now probably I have $300 left." The trial court did not make a specific finding on the value of this asset.

The largest assets[4] awarded to Sue in the property division were four individual retirement accounts in Ed's name. The value of these four accounts, as of the May 2019 statement period, was approximately $680,000.

### b. Sufficiency of property awarded to Sue

Ed argues that through these assets—specifically the cash in bank accounts and the retirement accounts—Sue has sufficient liquidity to meet her minimum reasonable needs for several years, even without accounting for any growth in the assets. He points out that although Sue will have federal income tax liability resulting from the withdrawal of funds in the retirement accounts, she will be able to access those funds without paying an additional penalty at age 59 ½.[5] *See, e.g.*, 26 U.S.C.

---

[4]     The trial court also awarded Sue two vehicles (valued at approximately $19,000 and $11,000), a 50% interest in the vehicle driven by her daughter (valued at approximately $34,000), and 50% of the community estate's membership interest in ERTexan Investments, LLC. ERTexan owns a parking lot near Minute Maid Park in downtown Houston. Ed invested $150,000 in this business and owns a 50% membership interest. He testified that it was possible the Texas Department of Transportation would condemn the property via eminent domain for the proposed Interstate 45 expansion in the area, but discussions concerning this acquisition had been postponed. He did not believe that the investment had any current market value. Ed and Sue's 2017 tax returns reflected that they received $4,662 in income from ERTexan in that tax year.

[5]     Sue was 57 at the time of trial, and she has since reached age 59 ½.

19

§ 72(t)(1), (2)(A)(i) (providing that early distributions from qualified retirement plans are subject to 10% penalty until individual reaches age of 59 ½); *Attaguile v. Attaguile*, 584 S.W.3d 163, 183 (Tex. App.—El Paso 2018, no pet.); *see also* 26 U.S.C. § 408(d)(1) (providing that, generally, any amount paid or distributed out of individual retirement plan shall be included in gross income by payee or distributee). Ed estimates that, given Sue's monthly expenses of nearly $6,000, the cash awarded to her and the funds in the retirement accounts would meet her needs for approximately ten to twelve years, and by that point she will be in her late 60s and eligible to receive Social Security benefits. He therefore argues that monthly maintenance payments are not necessary to support her.

As discussed further below, although Sue's monthly expenses are approximately $6,000 per month, she has no source of income and the record contains evidence supporting the trial court's finding that Sue is not capable of full-time employment. Ed's calculations would thus require Sue to completely exhaust the cash awarded to her and the retirement benefits to cover her monthly expenses. As the trial court acknowledged in its conclusions of law, the law does not require a spouse to "spend down long-term assets, liquidate all available assets, or incur new debt simply to obtain job skills and meet needs in the short term." *See Benoit*, 2015 WL 9311401, at *11; *Everitt*, 2012 WL 3776343, at *8; *Dunaway*, 2007 WL 3342020, at *3. The property awarded to Sue in the divorce decree is significant and

can be used to pay several years' worth of expenses. However, with no source of income except for Social Security benefits that Sue expects to receive in the future, the assets awarded to Sue in the divorce decree and used to pay monthly expenses will become substantially depleted.

We conclude that despite the significant property awarded to Sue in the divorce decree, the trial court did not abuse its discretion by determining that Sue lacked sufficient property to provide for her minimum reasonable needs. *See* TEX. FAM. CODE § 8.051. We therefore turn to whether Sue presented sufficient evidence that she has an incapacitating mental disability which makes her eligible to receive maintenance payments.

### 2. Evidence of disability

The Family Code authorizes a trial court to award maintenance if a spouse is "unable to earn sufficient income to provide for the spouse's minimum reasonable needs because of an incapacitating physical or mental disability." *Id.* § 8.051(2)(A). No authority directly addresses the quantum of evidence that is required to prove incapacity in an action for maintenance. *Roberts*, 531 S.W.3d at 228–29; *Smith v. Smith*, 115 S.W.3d 303, 309 (Tex. App.—Corpus Christi–Edinburg 2003, no pet.); *Pickens v. Pickens*, 62 S.W.3d 212, 215 (Tex. App.—Dallas 2001, pet. denied). The Family Code does not require a spouse seeking maintenance due to an incapacitating physical or mental disability to present medical evidence. *Roberts*, 531 S.W.3d at

21

228; *Pickens*, 62 S.W.3d at 215 (contrasting provisions in Family Code concerning maintenance with state statutory provisions relating to workers' compensation benefits and federal statutory provisions relating to social security disability benefits, both of which expressly require medical evidence). Furthermore, absent a statutory requirement, "testimony on incapacity need not be limited to experts." *Pickens*, 62 S.W.3d at 215.

As the factfinder, the trial court may reasonably infer an individual's incapacity from circumstantial evidence or the competent testimony of a lay witness. *Roberts*, 531 S.W.3d at 228; *Smith*, 115 S.W.3d at 309; *Pickens*, 62 S.W.3d at 215. Questions relating to the extent and duration of incapacity can be answered by lay opinion testimony, and medical testimony is not required. *Pickens*, 62 S.W.3d at 216. "In fact, the testimony of the injured party will support a finding of incapacity even if directly contradicted by expert medical testimony." *Roberts*, 531 S.W.3d at 228 (quoting *Pickens*, 62 S.W.3d at 216).

However, the testimony "must still be sufficient and probative to establish a disability exists and to establish this disability prevents that party from obtaining gainful employment." *Id.* at 230; *see Chafino v. Chafino*, 228 S.W.3d 467, 475 (Tex. App.—El Paso 2007, no pet.) (concluding that trial court did not abuse its discretion in declining to award maintenance when wife testified about her medical problems, but record contained no "explanation of why her ailments prevent her from returning

to work as a bookkeeper"). The party seeking maintenance must present probative evidence "that rises above a mere assertion that unsubstantiated symptoms collectively amount to an incapacitating disability." *Roberts*, 531 S.W.3d at 230.

### a. Trial court's findings and relevant evidence

On appeal, Ed acknowledges that the record contains evidence that Sue has mental health disorders and struggles with alcohol and substance abuse. He argues, however, that the evidence does not establish that Sue's conditions are incapacitating such that she cannot work. He argues that the trial court's findings that Sue cannot work are undermined by her testimony that she did not want to work and that she planned to live off money Ed provided to her.

The trial court made several findings and conclusions relevant to Sue's disability and ability to work, including:

12. SUE SCHAFMAN tendered to the Court, as exhibits, her patient files from Menninger's Clinic, Baylor Psychiatric Clinic and Sun Behavior Medical Center.

13. The aforementioned exhibits conclusively demonstrated that SUE SCHAFMAN had received consistent diagnosis for mental illness from each institution to which she was admitted.

16. The Court heard testimony that during the litigation, SUE SCHAFMAN was admitted to Menninger Clinic for inpatient treatment of her mental health disorders.

17. The Court heard testimony from Matthew Estey, an employee of Menninger Clinic[,] that SUE SCHAFMAN would benefit from further treatment at Menninger Clinic in their outpatient program but that SUE SCHAFMAN did not have access to the financial resources to pay for said treatment.

19. During Final Trial, the Court heard testimony, by deposition, from Dr. Jeffrey Khan that SUE SCHAFMAN suffered from a debilitating mental disorder.

20. The Court found that Dr. Jeffrey Khan was properly qualified as an expert witness.

21. SUE SCHAFMAN testified to the Court that she lived in constant fear that her husband was plotting against her life.

22. The Court heard testimony from SUE SCHAFMAN that her husband was attempting to induce carbon monoxide poisoning and was plotting to poison her.

23. The Court heard testimony from SUE SCHAFMAN that she believed that her husband was installing video surveillance technology into her apartment in order to monitor her daily activities.

24. SUE SCHAFMAN tendered to the Court EXHIBIT SS-141, (a letter drafted by the Davenport Law Firm to Momentum BMW) wherein EDWARD SCHAFMAN's counsel admitted that SUE SCHAFMAN had documented mental illness.

25. The Court FINDS that SUE SCHAFMAN is not capable of full-time employment.

The trial court specifically found that Sue was a credible witness and that portions of Ed's testimony were not credible. The court concluded that Sue "suffered from a mental disability which prevented her from earning sufficient income to provide for her minimum reasonable needs" and was therefore eligible for maintenance.

At trial, it was undisputed that Sue had had difficulties with alcohol abuse, participating in several rehabilitation programs in 2006 and 2007 before attaining sobriety in 2007. Around that time, Sue was prescribed medication for anxiety and a muscle relaxer, and she continued to take these medications until trial. Around

2016, Sue's doctor started prescribing her Adderall to treat ADHD. Sue began drinking again in December 2018, and she acknowledged taking Adderall during the divorce proceedings, although she testified that she was not taking it at the time of the trial.

It was also undisputed that Sue had a mental health crisis after Ed filed for divorce and that, during the pendency of the proceedings, she was involuntarily committed for inpatient mental health treatment twice, received nearly two months of inpatient mental health treatment, received outpatient mental health treatment, had appointments with a psychiatrist, and voluntarily entered an alcohol rehabilitation facility on two occasions. Both Ed and Sue testified concerning the events that led to her arrest over Memorial Day weekend in 2018, her subsequent commitment at a behavioral health center, and her inpatient treatment at the Menninger Clinic following that. The trial court admitted Sue's medical records from each facility, all of which indicated that she had been diagnosed by multiple mental healthcare providers with delusional disorder, a psychotic disorder, or a disorder on the schizophrenia spectrum. Sue's delusions centered around her belief that Ed was trying to poison her and that he had her under constant surveillance, leading her to disable electronics and to disconnect lights, outlets, and appliances in the family home.

Although Ed disagreed with several of the diagnoses and statements made in Sue's medical records, he agreed that she had a mental illness. In July 2018, Ed's counsel sent a letter on Ed's behalf to Momentum BMW, stating that he would not be financially responsible for a vehicle that Sue had purchased in May 2018. After this purchase, the salesman purportedly contacted Ed and stated that he was concerned about Sue's mental state and behavior after she explained that she wanted to purchase a new vehicle because Ed had bugged her old one and was pumping carbon monoxide into their house. The salesman told Ed that he was also concerned about Sue's capacity to contract, but he completed the sale anyway. Ed's attorney wrote to the dealership, "Sue Schafman has documented significant mental deficiencies that do not allow her to fully comprehend her actions and certainly is not competent to enter into a financial transaction to buy a $40,000 car."

On appeal, Ed asserts that while the record contains evidence that Sue had "impaired" functioning at the time of her discharge from inpatient treatment at Menninger in July 2018, there was no evidence that, at the time of trial in August and September 2019, her condition was incapacitating such that she could not earn sufficient income to provide for her minimum reasonable needs. Specifically, Ed points to evidence that after her discharge from Menninger, Sue took several trips to California, New York, and Thailand. Sue continued handling matters related to her father's estate, and she was capable of making all necessary travel reservations and

26

accommodations. Ed agreed that Sue's health was concerning to him, but he did not agree that she was unable to work.

Sue called three witnesses to testify on her behalf. Matthew Estey, a licensed clinical social worker and the director of the Menninger 360 program, worked with Sue as she transitioned from inpatient treatment at Menninger to outpatient treatment at her apartment. He agreed with Sue's counsel that given the cost and length of inpatient treatment at Menninger, the type of patients the clinic saw typically had "significant impairment in functioning" and Menninger was "usually the last stop for people who may have maybe tried other kind of treatments and hasn't been successful." With respect to Sue specifically, almost immediately after her discharge, she purchased or leased an expensive vehicle "just pretty impulsively," and Estey worked with Sue on budgeting and returning the vehicle. Sue was not able to create a budget or "understand the cost of things." Estey also observed Sue interact with people at her new residence and at the bank, and he was concerned over the amount of personal information that she shared, and he believed someone could potentially take advantage of her.

Estey also testified that Sue had difficulties with organization, not only organizing the environment around her—her new apartment—but also "cognitively organizing her thoughts." Estey assisted Sue with paperwork, which she found "pretty overwhelming" and "very challenging." He stated, "The idea of her being

able to do it all on her own, I thought was probably not likely." Sue also had difficulties with getting ready for appointments, arriving at appointments on time, and missing appointments. Sue "struggled to do that with the support of the team," and Estey believed that it would be challenging for Sue to keep track of appointments and "kind of just keep herself together." He also testified that it was "fairly clear" when he interacted with Sue that she "believed that certain things had happened that I think did not happen. Whether that was being, like, spied on, being trailed, you know, possibly, like, poisoned; things like that."

Estey stated that the recommendation—which was not followed due to financial reasons—was for Sue to remain in the Menninger 360 program for at least an additional month. This recommendation was made because "the whole team was concerned about Sue's ability to function on her own."

Laquinta Milson, a licensed professional counselor intern with the Menninger Clinic, also assisted with Sue's outpatient treatment in the Menninger 360 program. At the time Milson worked with her, Sue struggled with depression, daily living activities, lack of interaction with others, and isolation in her apartment. Milson recalled that there were days when treatment team members would contact Sue and she had not gotten out of bed for the day, or she had forgotten to brush her teeth or eat. Milson assisted Sue with budgeting and believed that it was not possible for Sue to take care of herself financially. She also believed that Sue "probably would have

needed some assistance" in taking care of her daily activities. On cross-examination, Milson agreed that she had not had any contact with Sue since Sue left the Menninger 360 program around September 2018.

Dr. Jeffrey Khan, a psychiatrist testifying by deposition, saw Sue on four occasions after her discharge from the Menninger Clinic: in September 2018, December 2018, January 2019, and February 2019. He prescribed several medications to Sue, including antipsychotic medications, an antianxiety medication, and antidepressants. Dr. Khan did not perform any formal vocational or work assessments or evaluations of Sue. He did not recall whether Sue ever spoke to him about her ability to work, but he did recall that Sue expressed her belief that "the assets she suspected were such that she did not need to work once she received her allocation" in the divorce proceedings. Dr. Khan testified that he would need additional information before he could give a formal opinion about whether Sue could work or hold a job. He was aware that Sue had made trips to Thailand concerning her father's estate, but he and Sue never discussed whether she had any problems when making those arrangements or handling her day-to-day activities while abroad.

During his deposition, Dr. Khan was asked whether he could form an opinion about Sue's mental state with respect to daily functioning. He responded that he

would need more specific information, but Sue can function "in, seemingly, a limited basis." Dr. Khan explained:

> Throughout our treatment she was not working. She was struggling to pay bills. According to her report, much of her time was spent involved in beliefs about her husband and things like she was not cooking because she had nobody to cook for, that she was spending much of the time in her apartment alone feeling that she had too many—you know, feeling the symptoms of depression, low energy, low motivation, low mood, that she was not leaving her apartment. . . . So to say she was functioning well in her day-to-day living, I think would be to underplay the significance of her symptoms. So that is why I answered in a limited way because the things that she reported to me was kind of—kind of living a limited life.

Dr. Khan stated that he had concerns about Sue's ability to function in her daily life, citing an instance in which Sue had driven around a neighborhood late at night searching for someone with whom she believed Ed was having an affair. He testified, "Using that as an example, you know, that would—if she was supposed to be at work but instead was kind of so consumed by a delusional thought, it would impair her ability to do those things." Over the few months Dr. Khan saw Sue, she struggled with treatment compliance, with doing "some kind of self-care things" such as cooking, and with "getting up and showering because she had no reason to get up and do that."

On June 30, 2019, approximately six weeks before trial began, Sue was involuntarily committed to Behavioral Hospital of Bellaire. The Certificate of Medical Examination, which was required for the State to obtain an emergency

detention order, stated that Sue had a diagnosis of delusional disorder, she had not been compliant with her medications, she was "paranoid and illogical," she had poor judgment, and she was "unable to care for self." The nurse completing the intake assessment stated:

> [Patient] is delusional, paranoid, someone is trying to kill her; [patient] has taken all her electronics apart thinking something inside that's spying on her. [Patient] is not taking her meds as instructed. Poor judgment, is unable to care for self due to illogical thinking that she's been constantly followed, tracked, harassed; then [patient] has to hire "flying monkeys" to follow her around. She's fearful of sleeping; poor appetite.

Sue reported that, due to the divorce proceedings, she had started drinking again. She reported drinking a bottle of wine per day and going to an alcohol rehabilitation facility. She also reported feeling depressed. Sue was discharged after spending nearly two weeks at this facility.

Sue testified concerning her desire and ability to work. Her work experience included working in a hotel, in a restaurant, and in office administration, but most of her work experience was from before she married Ed in 1988, and she had not worked at all since before the birth of their son in the early 1990s. Ed testified that after their son was born, the parties agreed that Sue would be a stay-at-home mother and homemaker until the children went to school. Sue did not return to work after the children started school or when they went to college. Sue denied agreeing to return to work when the children went to school.

31

When asked if she had a physical disability that prevented her from holding a job, Sue testified that she had some back issues and surgery on her neck several years ago. After that, she could not stand for long periods of time or do things like be in the yardwork or cook for hours. Sue agreed that there is a difference between being unable to work and unwilling to work. She also agreed that she has not tried to obtain a job.

Sue had the following lengthy exchange with Ed's counsel:

Q. So you don't think you could hold down a job down at Target?

A. No.

Q. Okay. Why couldn't you not think—you go to Target?

A. I go to Target, yes.

Q. Okay. All right. So you don't think you could hold down a job as someone working there, stocking the floors, cashier, whatever the jobs that they have at Target?

A. I'm well known [for] being late. I was late to my wedding.

Q. Okay. Well, that's something that can be cured with—

A. I get fired. I get fired all the time.

Q. Well, have you tried to go get a job there and then they fire you?

A. Not at my age right now. I don't want to, you know; I'm fine. I just want to be, you know, be at home and live.

Q. Okay.

A. I'm retired.

Q. Okay. You're retired. And I don't mean to offend anybody but how old are you?

A. I'm 57.

Q. All right. So 57 you just want to be retired and not work, correct?

A. I have things that I could do for myself because I've been taking care of my family all of my life. I want to do something for me.

Q. But that doesn't include working, right?

A. I'll be fine.

Q. You'll be fine. What do you mean you'll be fine?

A. I'll be fine without working.

Q. Okay. How are you going—how are you going to support yourself?

A. Well, Ed doesn't want me anymore and he's going to give me some money and I'm going to live on it.

Q. Okay.

A. Whatever I get.

Q. And you don't have any intention of helping contribute to that, correct?

A. Not at this point. I haven't thought about it because moving out of my house is going to be a big job, very big job, split things up, [the] children [are] going to be sad.

Q. Well, you said you want to do something for yourself. What does that mean?

A. Care for myself.

Sue stated that she is both unwilling and unable to work. She testified that she does not have the ability to go to work each day, stating:

Because I go in circle[s] in the morning with the medication that I'm taking. It slows me down because the thinking process, I think too much, too fast. So they gave me the medicine to slow down, which I don't like it. And I get really confused; you know, I go to one place and go back again and just can't function right now. It's too much going on in my head.

33

With respect to problems while traveling, Sue testified that she has missed flights because she was late. She later agreed with Ed's counsel that, upon resolution of the divorce, she "want[s] to never work again" and she has no plan to return to the workforce.

### b. Whether evidence supports trial court's ruling

The record contains ample evidence that Sue has a serious mental health condition that has required inpatient care during the pendency of the divorce proceedings. It is also undisputed that she has had difficulties with alcohol abuse in the past, that she started drinking again during the divorce proceedings, and that she checked herself into a rehabilitation facility on two occasions during the proceedings. The second occasion occurred during a break in the trial, and Sue was staying at that facility on the third day of trial testimony.

Ed argues that the evidence is insufficient to support the trial court's determination because only Sue's testimony linked her purported inability to work to her mental health condition. Dr. Khan did not perform any kind of formal vocational assessment or evaluation, and while both Estey and Milson testified that they had concerns about Sue's ability to function and complete daily life activities while she was part of the Menninger 360 program, their last contact with Sue was approximately one year before the trial proceedings.

However, while none of the witnesses explicitly testified that Sue could not work because of her delusional disorder or her alcohol abuse, Sue, Dr. Khan, Estey, and Milson all presented evidence concerning specific daily tasks that Sue either could not do or could only do with assistance. Additionally, the trial court had before it testimony and medical records concerning Sue's involuntary commitment at the Behavioral Hospital of Bellaire, which occurred in June 2019, approximately six weeks before trial began. These records indicated that Sue had had another delusional episode, that doctors were concerned about the danger she presented to herself, and that she could not care for herself at the time. The trial court could reasonably infer from this evidence that Sue's mental health condition prevented her from working and earning sufficient income to meet her minimum reasonable needs. *See* TEX. FAM. CODE § 8.051(2)(A). The record therefore contains some evidence of a reasonable and probative character that Sue has an incapacitating mental disability. *See Roberts*, 531 S.W.3d at 230; *Pickens*, 62 S.W.3d at 216.

The record also contains evidence that Sue, who considers herself to be retired, has not attempted to find employment and that, upon divorce, Sue did not intend to work but instead intended to live off the property that she received in the divorce decree and support payments from Ed. Although this evidence is relevant and probative, we conclude that it does not outweigh the evidence of Sue's recent involuntary commitment for inpatient mental health treatment. Sue presented

35

evidence that her mental health condition had not abated, but instead continued to impair her functioning and impact her daily life. We conclude that the trial court's determination that Sue has an incapacitating mental disability that prevents her from earning sufficient income to meet her minimum reasonable needs is not so against the great weight and preponderance of the evidence such that the determination is clearly wrong and manifestly unjust. *See Dow Chem. Co.*, 46 S.W.3d at 242; *Smith*, 115 S.W.3d at 307 (upholding maintenance award when parties presented conflicting evidence concerning husband's ability to work). We hold that the trial court did not abuse its discretion in determining that Sue is eligible for spousal maintenance.[6]

We overrule Ed's first issue.

---

[6] Because we conclude that the trial court did not abuse its discretion in determining that Sue was eligible for maintenance under Family Code section 8.051(2)(A), we need not address whether Sue overcame the rebuttable statutory presumption against maintenance awarded under section 8.051(2)(B) and demonstrated her eligibility under that section. *See* TEX. FAM. CODE §§ 8.051(2)(B), 8.053(a) (setting out rebuttable presumption against maintenance awarded under section 8.051(2)(B) and requiring spouse seeking maintenance under that section to present evidence that they have exercised diligence in earning sufficient income or in developing necessary skills to provide for their minimum reasonable needs). If the spouse seeks maintenance pursuant to either section 8.051(2)(A) or (C), the presumption in section 8.053(a) does not apply. *See Kelly v. Kelly*, 634 S.W.3d 335, 366 (Tex. App.—Houston [1st Dist.] 2021, no pet.); *Benoit v. Benoit*, No. 01-15-00023-CV, 2015 WL 9311401, at *5 (Tex. App.—Houston [1st Dist.] Dec. 22, 2015, no pet.) (mem. op.).

## C.     *Amount and Duration of Maintenance Award*

If the court determines that a spouse is eligible to receive maintenance, the court "shall determine the nature, amount, duration, and manner of periodic payments by considering all relevant factors." TEX. FAM. CODE § 8.052. Section 8.052 sets out a non-exclusive list of eleven factors for courts to consider:

(1)     each spouse's ability to provide for that spouse's minimum reasonable needs independently, considering that spouse's financial resources on dissolution of the marriage;

(2)     the education and employment skills of the spouses, the time necessary to acquire sufficient education or training to enable the spouse seeking maintenance to earn sufficient income, and the availability and feasibility of that education or training;

(3)     the duration of the marriage;

(4)     the age, employment history, earning ability, and physical and emotional condition of the spouse seeking maintenance;

(5)     the effect on each spouse's ability to provide for that spouse's minimum reasonable needs while providing periodic child support payments or maintenance, if applicable;

(6)     acts by either spouse resulting in excessive or abnormal expenditures or destruction, concealment, or fraudulent disposition of community property, joint tenancy, or other property held in common;

(7)     the contribution by one spouse to the education, training, or increased earning power of the other spouse;

(8)     the property brought to the marriage by either spouse;

(9)     the contribution of a spouse as homemaker;

(10)    marital misconduct, including adultery and cruel treatment, by either spouse during the marriage; and

> (11) any history or pattern of family violence, as defined by [Family Code] Section 71.004.

*Id.*; *In re Marriage of Elabd*, 589 S.W.3d 280, 285–86 (Tex. App.—Waco 2019, no pet.). Section 8.052 "does not assign any weight to any particular factor." *Dunaway*, 2007 WL 3342020, at *4.

The Family Code limits the duration and the amount of maintenance awards. *See* TEX. FAM. CODE §§ 8.054–.055. If the trial court awards maintenance on the basis that the spouse has an incapacitating disability, the court may order maintenance for as long as the spouse satisfies the eligibility criteria for the maintenance award. *Id.* § 8.054(b); *see also id.* § 8.054(a)(2)(A) (providing that, generally, court shall limit duration of maintenance award to "the shortest reasonable period that allows the spouse seeking maintenance to earn sufficient income to provide for the spouse's minimum reasonable needs," unless spouse's ability to do so is substantially or totally diminished because of physical or mental disability). Absent an incapacitating disability, for spouses who have been married for thirty years or more, the trial court may not issue a maintenance award that remains in effect for more than ten years. *Id.* § 8.054(a)(1)(C). A court may not order a maintenance award that requires the obligor to pay, on a monthly basis, more than the lesser of $5,000 or 20% of the spouse's average monthly gross income. *Id.* § 8.055(a).

The trial court ordered Ed to pay Sue $3,333.33 per month in maintenance from November 2019 through October 2027, or for a period of eight years. The trial court's maintenance award is within the statutory parameters for both duration and amount of the award. The award is for eight years, which is less than the ten-year limit imposed on maintenance awards for spouses who have been married for thirty years or more like Ed and Sue. *See id.* § 8.054(a)(1)(C). The amount of the award, $3,333.33, is 20% of Ed's average gross monthly income,[7] which is less than $5,000, and is therefore the maximum amount the trial court could assess. *See id.* § 8.055(a) (providing that court may not order maintenance award requiring obligor to pay more than *lesser of* $5,000 or 20% of average monthly gross income) (emphasis added).

We therefore turn to the statutory factors the trial court must consider in determining the amount and duration of the maintenance award. *See id.* § 8.052. As noted above, the trial court had evidence before it that Sue, as a result of her mental health condition, could not work and had no income, but she had approximately $6,000 in expenses per month. Additionally, she had not worked at all since the beginning of the parties' marriage, which lasted thirty years. During the marriage, she was a homemaker and raised the parties' two children, who are now adults. Sue

---

[7]     The trial court found that Ed's yearly gross salary was $200,000. Based on this amount, his gross monthly salary is $16,666.66. Twenty percent of this amount of $3,333.33.

has a high school education and has taken some community college classes. Ed, on the other hand, has been a certified public accountant for nearly forty years and has owned his own accounting firm for nearly thirty years. Ed testified that he wants to retire within the next five years, but he is able to work. At the time of trial, Ed was 61 years old and Sue was 57 years old. *See id.* § 8.052(1)–(4), (9).

Although, as Ed points out, he did not receive any retirement benefits in the property division, the cash awarded to him was significantly less than that awarded to Sue, and the real property and vehicles awarded to him were all encumbered by mortgages or promissory notes, the trial court heard evidence that Ed was able to provide for his minimum reasonable needs because he was able to work and his salary as an accountant was around $200,000 per year. *See id.* § 8.052(1); *Smith*, 115 S.W.3d at 308 (considering, as relevant factors, community properties and liabilities apportioned to spouse in divorce as well as spouse's ability to meet his needs independently). Ed also paid $3,000 per month in temporary spousal support to Sue during the pendency of the divorce, and he paid the monthly rental payments on her apartment and other expenses. Ed provided no testimony that this caused him financial hardship or that he could not meet his own financial obligations. *See* TEX. FAM. CODE § 8.052(5).

Additionally, as discussed in more detail below, the trial court heard evidence of Ed's cruel treatment toward Sue, including evidence that they argued with

40

increasing frequency and Ed verbally abused Sue; they had at least one physical altercation; and Ed refused to pay for mental health treatment that Sue's doctors believed was necessary to treat her delusional disorder. *See id.* § 8.052(10).

Ed presented evidence that Sue spent lavishly during the course of the parties' marriage. Sue repeatedly used community funds to travel to Thailand to handle matters concerning her father's estate, and she spent thousands of dollars while in Thailand. The evidence also reflects, however, that both parties had an expensive lifestyle, with the parties owning multiple properties and luxury vehicles, and Ed investing in multiple business entities. *See id.* § 8.052(6).

The parties agree that no evidence was presented to the trial court concerning three factors: the contribution by one spouse to the education, training, or increased earning power of the other spouse; the property brought to the marriage by either spouse; and any history or pattern of family violence, as defined by Family Code section 71.004. *See id.* § 8.052(7), (8), (11).

The trial court had evidence before it on eight of the eleven factors enumerated in section 8.052. When we consider these factors and the supporting evidence, we hold that the trial court did not abuse its discretion when it ordered Ed to pay $3,333.33 per month in maintenance for eight years. *See id.* §§ 8.052, 8.054–.055; *In re Marriage of Elabd*, 589 S.W.3d at 287 (upholding trial court's maintenance award when, viewing evidence in light most favorable to award, record contained

"some evidence touching on many of the section 8.052 factors upon which the trial court based its decision"); *Amos*, 79 S.W.3d at 751 (upholding maintenance award of 20% of husband's gross monthly income because evidence was introduced detailing wife's "difficulty caused from her physical disability, her diminished earning ability and her minimal financial resources"); *see also Scott v. Scott*, No. 04-17-00155-CV, 2018 WL 2694817, at *5 (Tex. App.—San Antonio June 6, 2018, no pet.) (mem. op.) (concluding that trial court did not abuse its discretion in setting maintenance award because both duration and amount of award were within statutory parameters); *Alaghehband*, 2003 WL 1986777, at *5 (stating that spousal maintenance determination "is not made by way of a simple mathematical equation or a check-list of the factors enumerated in section 8.052," but is instead fact-specific determination to be made on case-by-case basis).

We overrule Ed's second issue.

**Finding of Cruel Treatment**

In his third issue, Ed contends that the trial court abused its discretion by finding him guilty of cruel treatment toward Sue, which was used as both the grounds for divorce and as a factor justifying the maintenance award to Sue. He argues that this finding is not supported by sufficient evidence, and he requests that this Court modify the divorce decree to delete cruelty as the grounds for divorce.

### A. Governing Law

The Family Code provides that the trial court may grant a divorce on several fault-based grounds. One such ground is cruelty. A trial court "may grant a divorce in favor of one spouse if the other spouse is guilty of cruel treatment toward the complaining spouse of a nature that renders further living together insupportable." TEX. FAM. CODE § 6.002; *Baker v. Baker*, 469 S.W.3d 269, 279–80 (Tex. App.—Houston [14th Dist.] 2015, no pet) (stating that trial court has discretion to choose between insupportability and fault-based grounds when deciding whether to grant divorce); *Newberry v. Newberry*, 351 S.W.3d 552, 557 (Tex. App.—El Paso 2011, no pet.) (noting that use of cruelty as basis for divorce is "infrequent" following introduction of no-fault divorce, but Texas courts may still grant divorce on this ground).

A spouse's conduct rises to the level of cruel treatment when their conduct renders the couple's living together insupportable. *Ayala v. Ayala*, 387 S.W.3d 721, 733 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *Newberry*, 351 S.W.3d at 557. "'Insupportable' for purposes of 'cruel treatment,' means incapable of being borne, unendurable, insufferable, or intolerable." *Ayala*, 387 S.W.3d at 733 (citing *Henry v. Henry*, 48 S.W.3d 468, 473–74 (Tex. App.—Houston [14th Dist.] 2001, no pet.)); *Newberry*, 351 S.W.3d at 557. "Abuse need not be limited to bodily injury; nonetheless, physical abuse will support granting a divorce on cruelty grounds."

*Newberry*, 351 S.W.3d at 557; *In re Marriage of Rice*, 96 S.W.3d 642, 648 (Tex. App.—Texarkana 2003, no pet.); *see also McCullough v. McCullough*, 36 S.W.2d 459, 462 (Tex. 1931) ("It is the settled law of this state that the cruel treatment provided by our statute as a ground for divorce is not confined to physical violence alone, but may consist of a series of studied and deliberate insults and provocations."). Acts occurring after the parties separate can support a finding of cruelty. *Ayala*, 387 S.W.3d at 733; *Newberry*, 351 S.W.3d at 557; *In re Marriage of Rice*, 96 S.W.3d at 648. "The accumulation of several different acts of cruelty may constitute sufficient grounds on which to grant a divorce." *Newberry*, 351 S.W.3d at 557.

The sufficiency and weight of the evidence necessary to prove cruelty "must, of necessity, be left to the sound discretion of the trier of fact." *Newberry*, 351 S.W.3d at 556; *In re Marriage of Rice*, 96 S.W.3d at 648. We will not disturb the trial court's finding of cruelty absent an abuse of discretion. *Newberry*, 351 S.W.3d at 556; *In re Marriage of Rice*, 96 S.W.3d at 648.

**B.      *Whether Evidence Supports Trial Court's Finding of Cruelty***

The trial court granted Sue's request for a divorce and dissolved the parties' marriage on the basis of cruelty. In its findings and conclusions, the trial court found:

> 28.      During Final Trial, the Court heard testimony from SUE SCHAFMAN that she was very close and bonded with her dog, Ginger. She further testified that after separation, her husband refused to allow her to see her dog, Ginger, causing SUE

SCHAFMAN to seek judicial intervention in order to see her dog.

29. The Court heard testimony that during the litigation, Ginger became gravely ill, requiring several trips to the veterinarian. The Court FINDS that EDWARD SCHAFMAN refused to pay for some of these expenses and sent the bills to SUE SCHAFMAN for her to pay these vet bills knowing she did not have access to the funds.

30. At Final Trial, SUE SCHAFMAN testified that her husband was both physically and verbally abusive to her during the marriage and that he had subjected her to economic deprivation. SUE SCHAFMAN testified that her husband would refer to her as "greedy" and told her she needed to "remember where she came from." SUE SCHAFMAN testified that her husband would throw the food she would cook on the ground and demand that she clean it up.[8]

31. SUE SCHAFMAN testified to the Court that on May 28, 2018, her husband forcibly took her purse from her possession and demanded half of its contents. SUE SCHAFMAN tendered to the Court the corresponding incident report, Exhibit SS-130, wherein SUE SCHAFMAN, had told the Bellaire Police Department that her husband had grabbed her ankles/legs and a scuffle began on the ground.

32. The Court found that SUE SCHAFMAN was a credible witness.

33. The Court found that portions of EDWARD SCHAFMAN's testimony were not credible.

---

[8] In his appellate brief, Ed argues that no testimony at trial was admitted to support the last sentence of Finding 30. In a letter to this Court, Sue's counsel acknowledged that inclusion of this sentence in Finding 30 was erroneous. Counsel stated, "While this information was known to trial counsel at the time of trial, that particular information was not known to the trial court and [was] absent from the record." Counsel noted that at the time she prepared the proposed findings of fact for the trial court, the reporter's record from the trial was not yet available and she relied upon her notes and memory.

The trial court concluded that Ed was guilty of cruel treatment toward Sue that rendered further living together insupportable.

Sue testified that Ed verbally and mentally abused her during their marriage. She stated that in the two to three years prior to Ed's filing for divorce, when they argued, Ed would say things like Sue "would not make it without him," he's "the one that make[s] the money, put[s] food on the table," Sue doesn't "deserve it," and Sue is "just not good enough." She denied that Ed would call her names, but he would manipulate and insult her by saying "You forgot where you came from. You forgot your root[s]," and he would call her greedy and ungrateful. At one point, Ed accused Sue of stealing from him. Sue testified that, in front of the parties' children, Ed "would act like he loves [her]," but she also believed that Ed spoke poorly about her to their children.

The trial court admitted extensive documentary evidence relating to Sue's mental health and rehabilitation treatment during the divorce proceedings. Included in her medical records is a psychosocial assessment completed on June 11, 2018, after Sue was admitted to the Menninger Clinic. The "Family Systems Review" portion of this assessment included the following information:

> She reports that she and her husband did not have a lot of conflict until about 15 years ago, and that their conflicts intensified about 5 years ago. She notes that he was controlling, and would at times yell at her, and that she would give in and try to control her reaction.

46

She recalls that she took good care of her two children and also took care of her husband when he had a heart attack about 4 years ago.

Right before she went into West Oaks [a rehabilitation facility], the last time that she was intoxicated [in 2007], she remembers that her husband grabbed her head and yelled an obscenity at her; she recalls that this was traumatic.

In addition to the incident described in the psychosocial assessment, both Ed and Sue testified that they had an altercation over Memorial Day weekend in 2018 that turned physical, although they disputed what happened during this incident. Ed testified that he and their daughter returned home from a trip to Austin and discovered that Sue had removed smoke detectors and outlets from the ceiling and walls, unplugged appliances, and turned off the power to the house. Ed and Sue began fighting over Sue's purse, and a scuffle ensued. Ed testified that Sue scratched his arm. Sue testified that Ed punched her in the knee. The trial court admitted the Bellaire Police Department's incident report concerning this altercation. In this report, Sue told the responding officer that Ed "attempted to get into her purse" and then "grabbed her ankles and legs." The responding officer observed scratch marks on Ed's arm, determined that Sue "was the aggressor in the incident," and placed Sue in custody.

As additional evidence supporting the trial court's cruelty finding, Sue points to several acts by Ed that occurred after divorce proceedings had been initiated. Sue points to Ed's acknowledgement that, almost immediately after Sue arrived in

Thailand in November 2017 to handle a matter concerning her father's estate, Ed told Sue via e-mail that he planned to seek a divorce. During a family meeting after Sue's arrest and emergency detention, Ed expressed his opinion that Sue had a drug and alcohol problem that was causing her delusions, and she needed to go to a rehabilitation facility. Ed did not participate in family therapy while Sue was at Menninger. Ed did not allow Sue to move back into the marital residence after she was discharged from Menninger, nor did he allow her to pick up her belongings from the parties' house that she wanted in her new apartment. Instead, he boxed up her belongings and sent them to her new address. Ed testified that he did this at Sue's request.

During the pendency of the divorce, Ed refused to allow Sue to have full possession of the family's dog, Ginger. He acknowledged that Sue considered Ginger to be "her" dog, but he stated that Ginger was a "family dog," and "the kids loved her." Eventually, after Sue sought temporary orders concerning possession of Ginger, Ed allowed Ginger to stay with Sue on certain days of the week. Ed also testified that he did not leave Ginger alone at the house frequently but instead brought her with him to his office, and he stated that he was the one who took care of Ginger when Sue was in Thailand. Estey, the Menninger 360 director, testified that Sue was "very upset" over not having Ginger with her, and she told him that she would not feel so alone if Ginger were with her. One of the psychiatrists at

Menninger wrote a letter stating that Sue was able to take care of Ginger and that Sue's mental health "would improve by reconnecting with her dog."

Ginger became ill during the divorce proceedings and required significant veterinary expenses. Ed paid for most of these expenses, but he disputed the last payment because he believed the vet was overcharging. Sue paid between $2,500 and $4,500 for Ginger's care.

Sue also points to evidence that Ed controlled her financially during the pendency of the divorce. Sue's records from Menninger indicate that, on June 13, 2018, Ed called the admissions department of the clinic and informed them that he would only pay for the first two weeks of inpatient treatment. The trial court issued a temporary order requiring Ed to pay for an additional two weeks of inpatient treatment at Menninger, and he ultimately paid over $100,000 in community funds for this treatment. During the litigation, the parties sold a piece of property and used a portion of the proceeds to pay for Sue's treatment at Menninger. After Sue's discharge from inpatient treatment at Menninger, she participated in the Menninger 360 program for around five weeks. Estey recommended that she stay in the program for longer, but Ed refused to pay for additional treatment through that program. Sue testified that finances were a concern for her when making doctor's appointments, and she agreed that that was why she was not obtaining the therapy that her doctors had recommended for her.

The trial court had before it conflicting evidence regarding Ed's treatment of Sue. Specifically, the evidence conflicted regarding who escalated the Memorial Day argument to a physical altercation and the handling and payment of Ginger's veterinary treatment. However, the record contains evidence that Ed insulted and belittled Sue with increasing frequency later in their marriage; at least one physical altercation between the parties occurred around the time Sue went to a rehabilitation facility in 2007; Ed attributed Sue's delusional episodes to her use of alcohol and Adderall and downplayed her need for mental health treatment and therapy; and Ed refused to continue paying for mental healthcare for Sue that her treatment team believed was necessary to assist with her recovery. *See Ayala*, 387 S.W.3d at 733 (considering acts occurring after parties separate); *Newberry*, 351 S.W.3d at 557 (noting that accumulation of several different acts of cruelty may constitute sufficient grounds for granting divorce).

This record therefore contains some evidence that Ed's conduct rendered the couple's living together insupportable and rose to the level of cruel treatment. *See* TEX. FAM. CODE § 6.002; *Ayala*, 387 S.W.3d at 733; *Newberry*, 351 S.W.3d at 557 (stating that "insupportable" in context of cruelty ground for divorce "means incapable of being borne, unendurable, insufferable, or intolerable"). We hold that the trial court did not abuse its discretion in finding that Ed was guilty of cruel

treatment toward Sue. *See Newberry*, 351 S.W.3d at 556; *In re Marriage of Rice*, 96 S.W.3d at 648.

We overrule Ed's third issue.

## Conclusion

We affirm the divorce decree of the trial court.

April L. Farris
Justice

Panel consists of Justices Goodman, Rivas-Molloy, and Farris.