Opinion issued May 18, 2017



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-16-00071-CV

_____

**RAHMATULLAH BASHA SYED, Appellant**

**V.**

**KHADIJA MASIHUDDIN, Appellee**

---

**On Appeal from the 311th District Court**
**Harris County, Texas**
**Trial Court Case No. 2014-05013**

---

## O P I N I O N

Appellant, Rahmatullah Basha Syed, appeals the trial court's final decree of divorce terminating his marriage to appellee, Khadija Masihuddin. In three issues, Syed challenges the portion of the trial court's decree finding that deviating from the standard possession order was in his minor children's best interest and ordering

that he have possession of or access to the children on the Saturdays following the first, third, and fifth Friday of each month, from 10:00 a.m. until 6:00 p.m. Because we conclude that sufficient evidence supported the trial court's determination such that its ruling did not constitute an abuse of discretion, we affirm.

## Background

In this proceeding, Syed and Masihuddin were seeking to dissolve their second marriage to each other. The parties were originally married by way of an arranged marriage negotiated by their parents. The appellate record contains very limited information regarding the parties' first marriage—Masihuddin testified that the wedding occurred in India and the parties subsequently moved to the United States and lived with her family. Masihuddin also testified that Syed left her in 2007, prior to the birth of the couple's first child, U.K., on July 3, 2008, in Houston. Syed, who is not a United States citizen, returned to India when he separated from Masihuddin the first time. Syed further testified that he first saw U.K. via Skype in January 2009. Syed testified that he communicated with U.K. "frequently" during that time period, that he sent Masihuddin pictures, and that he communicated with U.K. via Skype.

Masihuddin testified that she obtained a default divorce dissolving the first marriage in 2009, and, according to the testimony at trial, the final decree awarded Syed a standard visitation order as to U.K. and ordered him to pay child support.

Masihuddin testified that she did not object to the trial court's order granting a standard possession order in the first divorce—she had not been concerned about visitation because Syed was in India at the time. Masihuddin gave conflicting testimony about the communication between herself and Syed in the period between 2009 and 2012, in one instance testifying that she did not have any communication with him during that time, but later testifying that he sent her pictures in 2009 and that she was communicating with him at that point.

Syed visited the United States in 2012, and, according to Masihuddin, Syed sent a letter to Masihuddin's father stating that he wanted to visit U.K. in Houston. Syed was able to visit U.K. in July 2012 and gave U.K. a birthday gift. Around that same time, Masihuddin and her father made arrangements with Syed for Syed and Masihuddin to get remarried. Syed testified that he remarried Masihuddin because he loved U.K. and Masihuddin and because he felt like he had no choice but to remarry Masihuddin if he wanted "to be in [his] daughter's life." Masihuddin testified that she was willing to marry Syed again because he promised that he would not leave her again as he had done in 2007.

On July 21, 2012, the couple married for the second time. Masihuddin sponsored Syed so that he could remain in the United States and obtain appropriate immigration documents. They lived together at the same address with U.K. and with Masihuddin's family, including her mother, father, brothers, and sister.

During this time, Syed worked and contributed to the household finances. He also took U.K. to school and did other activities with her, such as going to the park. Masihuddin testified that she provided most of U.K.'s day-to-day care.

On December 18, 2012, while Masihuddin was pregnant with the couple's second child, she and Syed separated for a second time.

Syed alleges that this second separation occurred when he left the house they shared because of the "verbal abuse, the emotional abuse, [and] financial abuse" committed against him by Masihuddin and her parents and brothers. He testified that Masihuddin started a quarrel with him, demanding, among other things, that he turn his paycheck over to her. She also took his cell phone away from him. He decided to leave the house, but Masihuddin's father began verbally abusing him. Syed further testified that Masihuddin's father and brother "snatched" his bags and other property away from him, including his passport, his money, his permanent residency card, and his work authorization card, and they physically attempted to prevent him from leaving. Syed testified that he stayed in the house while Masihuddin, her father, mother, and brothers threatened him, including by telling him that he could not leave and that he would not see his children. Masihuddin denied that she ever mistreated Syed.

Syed testified that he reported the December 18, 2012 incident to the family violence unit of the Houston Police Department. Syed further testified that on

4

December 20, 2012, he returned to Masihuddin's home to retrieve his personal belongings, but her family refused to give them to him. He further testified that Masihuddin's brother grabbed him by his collar and "snatched away [his] phone when [he] was seeking help from 9-1-1." Syed stated that the brother "smashed the phone . . . on the ground. He grabbed my belongings, vandalized on the street." Syed further testified that Masihuddin's brother tried to force him to stay against his will, but then the police arrived. Syed was able to get all of his possessions at that time except for his immigration documents, and then the police asked him to leave, which he did.

Syed testified that he began living in his local mosque after he left Masihuddin's home. He further testified that, on December 23, 2012, Masihuddin's mother called the mosque in an attempt to have him removed, but he continued to stay there for several months until he could obtain an apartment of his own.

In January 2013, less than two weeks after she and Syed separated for the second time, Masihuddin and her family moved to a new home. Masihuddin did not give Syed their new address because she "did not know what his contact number was." Syed further stated that at the time of trial he was part of an address confidentiality program operated by the Attorney General's Office, and

Masihuddin's testimony indicated that she became aware of that fact during a hearing in the trial court that occurred at some point prior to the trial.

Syed's and Masihuddin's second child, U.H., was born on June 16, 2013. Masihuddin did not list Syed's name on U.H.'s birth certificate. She testified at trial that this was because the hospital staff advised her not to list her husband because "he was not there."

Syed testified that he tried to locate Masihuddin and his children, including by visiting his former neighbors beginning in January 2013 and by seeking help from a local imam to arrange visitation with Masihuddin and his children, which Masihuddin or her father refused. Syed also procured help from the organization Child Find America, a non-profit that assisted parents in locating their estranged minor children. Child Find was able to discover Masihuddin's new address, but its internal policy prevented it from disclosing the new address to Syed. However, Child Find provided the address to the police in the area where Masihuddin was living with her parents, and police were able to conduct a welfare check on the girls in August 2013. Masihuddin acknowledged that the police visited her home to check on U.K. and U.H.'s welfare in 2013.

Syed testified that during this period, between his separation from Masihuddin and his filing of the divorce petition, he was not able to have any communication with his children. He stated that he sent cards telling them he

missed them. However, all of the cards were returned to him marked as refused. Syed also testified that, in January 2013, he sent a money order for $300 out of his last paycheck received in 2012. However, Syed did not know whether Masihuddin received or cashed the money order.

Syed officially filed for divorce in February 2014. According to the testimony at trial, he also contested paternity at one point, asking Masihuddin to obtain a genetic test of U.H. However, at the trial, Syed testified that he acknowledged his paternity of U.H., and the parties asked the trial court to take judicial notice of the results of the paternity test.[1]

Beginning in May 2015, Syed was able to obtain court-ordered visitation with U.K. The parties testified that the trial court had entered temporary visitation orders that required supervised "SAFE visits" so that U.K. could become familiar with her father. Masihuddin caused U.K. to miss two of these visitation appointments.

In September 2015, the temporary orders were modified, enabling Syed to have unsupervised visitation with both U.K. and U.H. on four enumerated Saturdays in the month and half leading up to the trial, from 10:00 a.m. until 6:00 p.m. Masihuddin acknowledged keeping U.H., then two years old, from visiting

---

[1] The paternity test was not included in the record on appeal.

Syed during one of these court-ordered Saturday visitation periods because U.H. was crying and did not want to get in the car with Syed.

In a separate incident, on September 26, 2015, Syed's attempt to exercise his possession of the children resulted in both parties calling the police. U.H. did not want to get into the car with her father and clung to her mother. Syed took the child from Masihuddin and walked down the block. Masihuddin testified that she called police because Syed "grabbed the child, and he went out of my sight." Syed testified that he was fleeing Masihuddin's brother who was threatening his life. Masihuddin acknowledged that two of her brothers were present that day and came outside while she attempted to calm U.H., but she stated that she did not hear her brothers say anything to Syed. Police arrived on the scene, checked the car seat in Syed's vehicle, and instructed Syed to proceed with the visit. Syed then returned the children to Masihuddin when his visitation period was over.

During the trial, Masihuddin listed reasons for wanting Syed's access to the children restricted. Regarding U.K., who was seven at the time of trial, Masihuddin stated that she "worried about her hygiene" because U.K. "has a constipation problem, and sometimes she wets the bed." She also testified that U.K. occasionally needed toileting help due to her constipation problem, help that Masihuddin did not believe Syed should provide due to her religious beliefs, which provided that men cannot bathe or otherwise "touch [the] private parts" of girls

aged seven or older. Masihuddin also wished for her children to follow the tenents of her religion and to eat only food certified as halal.

Regarding U.H., who was two years old at the time of trial, Masihuddin stated that the child was still breastfed and needed to nurse at night in order to sleep, although she acknowledged that she had never sent any breast milk when U.H. visited her father. Masihuddin also testified that U.H. was able to drink whole milk. Masihuddin testified that she was concerned because Syed "has never practiced or relaxed with her, and this is new for [U.H.] also."

Masihuddin also testified that U.H. was born with a heart defect. She testified that "at the time of [U.H.'s birth], I came to know that she has two holes in her heart." Masihuddin further testified that she believed her daughter could be "adversely affected" if she cried and that U.H. should not be exposed to excessive heat.

At various times throughout her testimony, Masihuddin identified incidents of mistreatment by Syed. She testified that Syed had physically assaulted her on one occasion in 2007 when "[h]e grabbed [her] [up] the stairs." She testified that she became unconscious and Syed took her to the hospital. Masihuddin also testified that, on one occasion while they were married, Syed forced her to engage in sexual intercourse with him. She also testified that she hurt her neck when Syed took U.H. from her during the incident on September 26, 2015. She stated that she

9

had concerns about his hurting her again or hurting the children. However, Masihuddin also testified that she had sought to reconcile with Syed following their second separation, and she stated there would be no problem "[i]f we all lived together." And she also agreed that Syed had never harmed the children in any way.

Regarding Syed's visitations with the children based on the trial court's temporary orders, Masihuddin testified that, on one occasion, U.H. returned from a visit with Syed and "the diaper was not changed properly." Further testimony indicated that Syed had placed the diaper on backward. On another occasion, U.H. came home without a diaper and without her shoes and with dirty socks. Finally, Masihuddin testified that U.K. returned from a visit with Syed with "mosquito bites on her stomach and legs," although she also agreed that U.K. did not become sick from the bites.

Syed testified that, at the time of trial, he lived in a one-bedroom, one-bathroom apartment with his mother, who was visiting from India and would be returning home after the trial. He believed that his apartment was too small to have his daughters stay overnight, but he also testified that he was aware that his current apartment complex had a two bedroom apartment available and that he was willing and able to rent the two-bedroom apartment if he was granted overnight visitation with his daughters. He also acknowledged that, other than a few toys, he did not

have clothing, bedding, or other child-appropriate items necessary to provide more extended care for either U.K. or U.H.

At trial, Syed and Masihuddin both testified extensively about other issues relevant to the divorce proceedings generally. Regarding Syed's immigration status, Masihuddin testified that she sponsored him in 2012, and he obtained documents to stay in the United States that were good for two years. Syed testified that he had obtained an extension of those papers and that, while he was still a citizen of India with an Indian passport, he was a legal resident of the United States.

Regarding his employment history, Syed stated that he had a master's degree in public health and that he was a licensed physician in India, but he was not able to practice medicine in the United States. Syed testified that he had been unemployed for a significant period of time between his separation from Masihuddin in December 2012 and June 2014. Syed testified that, at the time of trial, he was employed at International Bank of Commerce and that he had been employed there for almost a year. Syed further testified that he had waived health insurance coverage after being granted a health insurance exemption, and in return, he received an additional $50 per paycheck. Syed stated that he used a Gold Card from Harris Health Services when he needed medical care. He testified that the insurance he opted out of was just for him—he did not know if insurance coverage

11

for his children was available through his employer or what it would cost for him to insure them. He testified that his children were on Medicaid.

The trial court entered a final divorce decree. The trial court named Masihuddin as sole managing conservator and Syed as a possessory conservator. The trial court further found that that "a Standard Possession Order is unworkable and inappropriate [and] is not in the best interest of the children" and that "the terms of the following possession order [are] not more restrictive than necessary to protect the best interest of the children." It ordered that Syed have access to his daughters on the Saturdays following the first, third, and fifth Fridays of each month from 10:00 a.m. to 6:00 p.m. No other provisions for any visitation or possession by Syed were made.[2]

Syed requested that the trial court file findings of fact pursuant to Family Code section 153.258, requiring the trial court to state the specific reasons for its deviation from the standard possession order.[3] Syed later filed a timely notice of past-due findings of fact. After the case was filed in this Court, we ordered an

---

[2]     The trial court also entered orders regarding support and dividing the marital estate, but Syed challenges only the portion of the order addressing his possession of and access to his children in his capacity as their possessory conservator.

[3]     Family Code section 153.258 provides that if the trial court deviates from the standard possession order and orders less visitation than the guidelines require, it shall, upon timely request, state in the order the specific reasons for the variance from the standard order. TEX. FAM. CODE ANN. § 153.258 (West 2014).

abatement so that the trial court could provide the requested findings. The trial court subsequently made the following findings of fact, among others:

[The] periods of possession vary from the Standard Possession Order for the following reasons:

a) Petitioner, Rahmatullah Basha Syed's failure to care for the children's hygiene during his periods of possession;

b) Petitioner, Rahmatullah Basha Syed's failure to have supported the children while employed;

c) Petitioner, Rahmatullah Basha Syed's neglect of children when they were injured, or bitten by insects;

d) Petitioner, Rahmatullah Basha Syed's failure to put the children's needs before his own;

e) Petitioner, Rahmatullah Basha Syed's inability to empathize with the children;

f) Petitioner, Rahmatullah Basha Syed's inability to model good behavior for his own children;

g) Credible evidence that Petitioner, Rahmatullah Basha Syed, has a history or pattern of past or present neglect of his children; and,

h) Credible evidence that Petitioner, Rahmatullah Basha Syed, was dishonest in his communication with Law Enforcement authorities.

### Deviation from the Standard Possession Order

In his first issue on appeal, Syed argues that the trial court abused its discretion by restricting his possession of and access to the children more severely than was necessary to protect the children's best interest. In his second issue, he argues that the trial court abused its discretion by restricting his possession of and

access to the children "for reasons that are not supported by sufficient evidence in the record." In his third issue, Syed argues that the trial court abused its discretion by restricting his periods of possession "for improper reasons, such as his religious practices, his past accrual of child support arrears, or his use of public benefits and services for family violence victims." We consider these issues together.

## A.      Standard of Review

"The best interest of the child shall always be the primary consideration of the court in determining issues of conservatorship and possession of and access to the child." TEX. FAM. CODE ANN. § 153.002 (West 2014). Specifically, the legislature has articulated the public policy of this state:

(a) The public policy of this state is to:

> (1) assure that children will have frequent and continuing contact with parents who have shown the ability to act in the best interest of the child;

> (2) provide a safe, stable, and nonviolent environment for the child; and

> (3) encourage parents to share in the rights and duties of raising their child after the parents have separated or dissolved their marriage.

(b) A court may not render an order that conditions the right of a conservator to possession of or access to a child on the payment of child support.

Id. § 153.001 (West 2014).

14

In determining the issues of conservatorship and possession of a child, the trial court is given wide latitude in determining the best interest of the child and will be reversed only for an abuse of discretion. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982); *Mauldin v Clements*, 428 S.W.3d 247, 268 (Tex. App.—Houston [1st Dist.] 2014, no pet.). This is, in part, because the trial court is in a better position having faced the parties and their witnesses, observed their demeanor, and had the opportunity to evaluate the claims made by each parent. *Coleman v. Coleman*, 109 S.W.3d 108, 111 (Tex. App.—Austin 2003, no pet.); *Martinez v. Molinar*, 953 S.W.2d 399, 403 (Tex. App.—El Paso 1997, no writ). The judgment of the trial court will be reversed only if it appears from the record as a whole that the trial court abused its discretion. *Gillespie*, 644 S.W.2d at 451. The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles; in other words, whether the act was arbitrary or unreasonable. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990).

Under an abuse of discretion standard, legal and factual insufficiency are not independent grounds for asserting error, but are relevant factors in assessing whether a trial court abused its discretion. *Niskar v. Niskar*, 136 S.W.3d 749, 753 (Tex. App.—Dallas 2004, no pet.). In determining whether there has been an abuse of discretion because the evidence is legally or factually insufficient to support the trial court's decision, we consider whether the trial court had sufficient information

15

upon which to exercise its discretion and whether it erred in its application of that discretion. *In re M.M.M.*, 307 S.W.3d 846, 849 (Tex. App.—Fort Worth 2010, no pet.). The traditional sufficiency review is involved in answering the first question[4] and whether the trial court made a reasonable decision in answering the second. *Id.*

When the testimony of witnesses is conflicting, we will not disturb the credibility determinations made by the fact finder, and we will presume that it resolved any conflict in favor of the verdict. *See Coleman*, 109 S.W.3d at 111; *Minjarez v. Minjarez*, 495 S.W.2d 630, 632 (Tex. App.—Amarillo 1973, no writ).

## B.   The Law Regarding Deviation from Standard Possession Order

All of Syed's issues on appeal challenge the portion of the trial court's order providing him with less visitation with U.K. and U.H. than called for by a standard possession order. He argues that the trial court's specific findings on this issue are either unsupported by the evidence or are improper considerations in determining

---

[4]   In conducting a legal sufficiency review, an appellate court reviews all the evidence in a light favorable to the finding, crediting favorable evidence if a reasonable fact-finder could do so and disregarding contrary evidence unless a reasonable fact finder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). In reviewing a no-evidence point, the appellate court must view evidence in the light that tends to support the finding of the disputed fact, and it must disregard all evidence and inferences to contrary. *Lenz v. Lenz*, 79 S.W.3d 10, 13 (Tex. 2002); *Lewelling v. Lewelling*, 796 S.W.2d 164, 166 (Tex. 1990). If the evidence would enable reasonable and fair-minded people to differ in their conclusions, then the fact-finder must be allowed to do so. *City of Keller*, 168 S.W.3d at 822. A reviewing court cannot substitute its judgment for that of the fact-finder, so long as the evidence falls within this zone of reasonable disagreement. *Id.*

16

the issue of possession. And he argues that the trial court's order was more restrictive than necessary to serve the children's best interest.

In suits affecting the parent-child relationship, there is a rebuttable presumption that a standard possession order, as outlined in the statute, "(1) provides reasonable minimum possession of a child for a parent named as a possessory conservator or joint managing conservator; and (2) is in the best interest of the child." TEX. FAM. CODE ANN. § 153.252 (West 2014). A court may deviate from the terms of the standard order if those terms would be unworkable or inappropriate and against the child's best interest. *Id.* § 153.253 (West 2014) ("The court shall render an order that grants periods of possession of the child as similar as possible to those provided by the standard possession order if the work schedule or other special circumstances of the managing conservator, the possessory conservator, or the child, or the year-round school schedule of the child, make the standard order unworkable or inappropriate."); *see also id.* § 153.251(a) (West 2014) ("The guidelines established in the standard possession order are intended to guide the courts in ordering the terms and conditions for possession of a child by a parent named as a possessory conservator or as the minimum possession for a joint managing conservator.").

When deviating from the standard possession order, the trial court may consider: "(1) the age, developmental status, circumstances, needs, and best

interest of the child; (2) the circumstances of the managing conservator and of the parent named as a possessory conservator; and (3) any other relevant factor." *Id.* § 153.256 (West 2014). The trial court may also place conditions on a parent's access, such as supervised visitation, if necessary for the child's best interest. *In re K.S.*, 492 S.W.3d 419, 429 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (citing TEX. FAM. CODE ANN. § 153.004(e) (West 2014) ("It is a rebuttable presumption that it is not in the best interest of a child for a parent to have unsupervised visitation with the child if credible evidence is presented of a history or pattern of past or present child neglect. . . .")). However, the terms of an order limiting or restricting a parent's right to possession of or access to a child must not exceed those required to protect the best interest of the child. TEX. FAM. CODE ANN. § 153.193 (West 2014).

## C.    Analysis

The trial court made numerous findings of fact in support of the portion of its decree awarding Syed unsupervised visitation with U.K. and U.H. on the Saturdays following the first, third, and fifth Fridays of each month. Among other findings, the trial court made some findings, such as those setting out U.K.'s date of birth and other relevant dates, that Syed does not challenge. For example, the trial court's findings and the evidence demonstrated that U.K. and U.H. were seven and two, respectively, at the time of trial. The trial court found, and the evidence

demonstrated, that Syed left Masihuddin in 2007 while she was pregnant with U.K. and that, following their second marriage, he again left Masihuddin while she was pregnant with U.H. and again had almost no contact with the children between December 18, 2012, and May 2015 when the trial court allowed him to begin having visitation.

The trial court also made numerous findings regarding what it described as a history of pattern of neglect. *See In re K.S.*, 492 S.W.3d at 429 (citing TEX. FAM. CODE ANN. § 153.004(e)). Specifically, the trial court found that Syed did not meet U.K. until July 2012, which the evidence demonstrated was around the time of her fourth birthday, and that he did not exercise any of the possession of U.K. awarded him in the first divorce decree or otherwise have contact with her between the time that he left Masihuddin in 2007 and the time they met in 2012 just prior to his remarriage to Masihuddin. The trial court found, among other facts, that Syed neglected the children by "having little or no contact when he could have seen them at any time, prior to the divorce filing"; that Syed "did not choose to see his second daughter until she was two years old"; and that "[d]uring the parties' second marriage, [Syed] did not care for the children for two years."

The record supports these findings. At some time in 2007, Syed left Masihuddin while she was pregnant with U.K. and returned to India. Although Syed testified, and Masihuddin agreed, that he had at least some contact with her in

the time period between 2009 and 2012, it was within the trial court's discretion to determine that such limited contact—such as sending pictures on one occasion and communicating on other occasions with Masihuddin via Skype—constituted insufficient contact to fulfill his duties and obligations as a parent. Furthermore, the evidence is uncontroverted that Syed did not meet U.K. in person until around the time of her fourth birthday. There was no evidence in the record that he had made any attempts to meet U.K. in person or have any visitation with her during the time between his first divorce from Masihuddin in 2009 and their subsequent remarriage in 2012.

Syed and Masihuddin both testified that Syed returned to the United States in 2012 and contacted Masihuddin's father to arrange an opportunity to visit U.K. At this time, the parties remarried in July 2012. However, several months later, in December 2012, Syed again left Masihuddin while she was pregnant with the couple's second child. The evidence was uncontroverted that Syed did not have any contact with either U.K. or U.H. between December 2012 and May 2015.

Although Syed testified that he made several attempts to contact Masihuddin during this time, we note that the only evidence in the record regarding his efforts to see the children during this time came from the frequently conflicting testimony of Syed and Masihuddin. Syed testified that he asked his former neighbors, his local imam, and the Child Find organization to help him locate Masihuddin and her

family. While Masihuddin agreed that the local police came to check on the wellbeing of the children at one point during her second separation from Syed, her repeated testimony at trial was that Syed had abandoned her and her children. Given this conflicting testimony, it was within the trial court's role as factfinder—who was in a better position to make such determinations, having faced the parties and their witnesses, observed their demeanor, and had the opportunity to evaluate the claims made by each parent—to credit Masihuddin's testimony and discredit Syed's. *See Coleman*, 109 S.W.3d at 111 (holding that trial court is in best position to observe parties and witnesses and evaluate claims and, thus, we will not disturb its judgment absent abuse of discretion); *see also City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005) (holding that if evidence would enable reasonable and fair-minded people to differ in their conclusions, then fact-finder must be allowed to do so, and reviewing court cannot substitute its judgment for that of fact-finder so long as evidence falls within this zone of reasonable disagreement).

Based on these findings and evidence, we conclude that the trial court had sufficient information upon which to exercise its discretion and that it did not abuse its discretion in rendering the order here. *See Gillespie*, 644 S.W.2d at 451 (holding that trial court has wide latitude in determining best interest of children and will be reversed only for abuse of discretion); *In re M.M.M.*, 307 S.W.3d at 849 (holding that in determining whether trial court abused its discretion because

of legally or factually insufficient evidence, appellate court considers whether trial court had sufficient information upon which to exercise its discretion and whether it erred in its application of that discretion).

In his second issue, Syed makes numerous challenges to the accuracy of the trial court's fact findings, arguing that many of them are not supported by sufficient evidence. In his third issue, Syed argues several of the trial court's fact findings constituted improper consideration in evaluating his rights of possession of or access to U.K. and U.H. However, because we conclude that the findings outlined above are supported by sufficient evidence to allow the trial court to make its determination deviating from the standard possession order and that the trial court's determination did not constitute an abuse of discretion, we need not analyze every one of the remaining findings of fact.

We overrule Syed's second and third issues.

In his first issue, Syed argues that the trial court's determination to award him less than a standard possession order—to award only two or three eight-hour visitations per month, with no overnight or holiday visitation—was an abuse of discretion because it restricted his "possession of and access to his children more severely than necessary to protect the children's best interest." We disagree.

The trial court found, for example, that Syed "had never cared for the children overnight" and that he had "failed to provide a proper living environment

22

for the children to visit with him." Syed argues that he cared for U.K. overnight during the time he lived with her and Masihuddin following the couple's second marriage in July 2012 and that he also took U.K. to school and other places like the park. However, Masihuddin testified that during that five month period, she provided virtually all of U.K.'s care. It was not an abuse of discretion for the trial court to determine, based on this evidence, that Syed had not provided care for the children overnight.

The evidence at trial further demonstrated that Syed lived in a one-bedroom, one-bathroom apartment. Syed testified that he believed that his apartment was too small for his children to come for overnight visits, and he stated that he only had a few toys or other items for the girls in his home. Syed testified that he was willing to obtain a larger apartment, but it is undisputed that he had not done so at the time of trial. He had never purchased nor provided any diapers, clothing, or other items that the children would need to have more extended visits.

Given these findings and supporting evidence demonstrating Syed's lack of regular involvement with his children, his inexperience with parenting, and his inadequate living conditions, we cannot say the trial court abused its discretion in limiting his visitation to regular daytime visits. The visitation schedule set out by the trial court is not more restrictive than necessary to balance the children's interest in "having frequent and continuing contact with parents who have shown

23

the ability to act in the best interest of the child" and their interest in having a safe, stable environment.[5] *See* TEX. FAM. CODE ANN. §§ 153.001, 153.193.

We overrule Syed's first issue.

## Conclusion

We affirm the trial court's final decree.

Evelyn V. Keyes
Justice

Panel consists of Justices Jennings, Keyes, and Huddle.

---

[5] We further observe that the trial court retains jurisdiction to modify its conservatorship order when it is in the children's best interest and the parents' circumstances have changed materially and substantially. *In re J.A.J.*, 243 S.W.3d 611, 617 (Tex. 2007); *see* TEX. FAM. CODE ANN. § 156.001 (West 2014) (providing that court with continuing exclusive jurisdiction may modify order providing for conservatorship, support, possession of, or access to child); *id.* § 156.002 (West 2014) (stating that person affected by order or who has standing to sue under Chapter 102 may file suit for modification); *id.* § 156.101 (West 2014) (providing grounds for modifying order establishing conservatorship or possession and access).