**Opinion issued May 4, 2023**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-22-00290-CV

————————————

## JOY M. PEREZ, Appellant

## V.

## JONATHAN L. PEREZ, Appellee

On Appeal from the 201st District Court
Travis County, Texas[1]
Trial Court Case No. D-1-FM-19-007880

## MEMORANDUM OPINION

---

[1] Pursuant to its docket equalization authority, the Supreme Court of Texas transferred this appeal to this Court. *See* Misc. Docket No. 22-9025 (Tex. Mar. 29, 2022); *see also* TEX. GOV'T CODE ANN. § 73.001 (authorizing transfer of cases). We are unaware of any conflict between the precedent of the Court of Appeals for the Third District and that of this Court on any relevant issue. *See* TEX. R. APP. P. 41.3.

Appellant, Joy M. Perez ("Joy"), challenges the trial court's final divorce decree, entered after a bench trial, in her suit for divorce against appellee, Jonathan L. Perez ("Jonathan"). In seven issues, Joy contends that the trial court erred in determining that the parties did not have an enforceable premarital agreement, in characterizing separate property as community property, and in dividing the community property.

We reverse and remand.

**Background**

In her first amended petition for divorce, Joy alleged that she and Jonathan "were married on or about October 23, 2015 and ceased to live together as husband and wife on or around October 15, 2019." According to Joy, the marriage had become "insupportable because of discord or conflict of personalities." Joy alleged that she and Jonathan had "entered into a premarital agreement" before getting married.

Joy argued that she should "be awarded a disproportionate share" of the community estate because she was "the spouse to whom conservatorship of the child [wa]s likely to be granted"; because of her financial and other contributions, including those from her own separate estate to the community estate during the marriage; because of her reimbursement claims; because of the "[c]ommunity [estate's] indebtedness and liabilities"; and because of Jonathan's "waste of

community assets." Joy requested that the trial court award her attorney's fees and costs.

Jonathan filed a counterpetition for divorce in which he stipulated to the dates of marriage and separation alleged by Joy and the reason for seeking the divorce. He requested a "just and right" division of the community estate. Jonathan also specifically requested that the trial court order that Joy's separate estate reimburse the community estate "for funds or assets" it had expended "for the benefit of [Joy's] separate estate" because "[t]hose expenditures resulted in a direct benefit to [Joy's] separate estate" and "[t]he community estate ha[d] not been adequately compensated for or benefited from the expenditure of those funds or assets," and if it were not reimbursed, Joy's separate estate would be unjustly enriched "at the expense of the community estate."[2] Further, Jonathan requested that the trial court award him "post-divorce maintenance for a reasonable period," his attorney's fees, and costs.

During pretrial discovery, Joy served Jonathan with, among other things, a request for admissions.[3] In his response to Joy's request, Jonathan made the following admissions:

---

[2] Both Joy and Jonathan also addressed custody and support issues as to their minor child in their pleadings. Those issues are not relevant to this appeal.

[3] *See* TEX. R. CIV. P. 198.1.

1. He "signed a [p]re-[m]arital [a]greement/[p]artition and [e]xchange [a]greement [(the "premarital agreement")] prior to [his] marriage to [Joy] on October 23, 2015."

2. He signed the premarital agreement "by writing [his] signature and [his] initials on the document."

3. Joy "signed the same [premarital agreement] that [Jonathan] signed."

4. He "took the [premarital agreement] to have it notarized."

5. He "took the signed [premarital agreement] to have it notarized on the day of the rehearsal dinner before [his] wedding to [Joy]."

6. Joy "was with [him] when [he] signed the [premarital agreement]."

7. He "was with [Joy] when she signed the [premarital agreement]."

. . . .

14. The premarital agreement that he signed "provided a fair and reasonable disclosure of the property and financial obligations of [Joy] prior to [his] signing the document."

15. He "voluntarily signed the waiver of any right to disclosure of the property and financial obligations of [Joy]."

. . . .

17. The premarital agreement "attached as Exhibit A" to Joy's request for admissions was "an unsigned copy of the [premarital agreement] signed by [Jonathan] prior to October 23, 2015."

18. The premarital agreement "attached as Exhibit A" to Joy's request for admissions was "an unsigned copy of the document referenced in Admission No. 1 above."

19. The premarital agreement "attached as Exhibit A" to Joy's request for admissions was "an unsigned copy of the document referenced in Admission No. 2 above."

4

20. The premarital agreement "attached as Exhibit A" to Joy's request for admissions was "an unsigned copy of the document referenced in Admission No. 3 above."

21. The premarital agreement "attached as Exhibit A" to Joy's request for admissions was "an unsigned copy of the document referenced in Admission No. 4 above."

22. The premarital agreement "attached as Exhibit A" to Joy's request for admissions was "an unsigned copy of the document referenced in Admission No. 5 above."

23. The premarital agreement "attached as Exhibit A" to Joy's request for admissions was "an unsigned copy of the document referenced in Admission No. 6 above."

24. The premarital agreement "attached as Exhibit A" to Joy's request for admissions was "an unsigned copy of the document referenced in Admission No. 7 above."

At trial, the trial court admitted into evidence a copy of Joy's request for admissions, as Exhibit P-2, and a copy of Jonathan's response to Joy's request for admissions, as Exhibit P-52. Joy confirmed during her testimony that Exhibit P-52 was her request for admissions that she served on Jonathan and Exhibit P-2 was Jonathan's response to her request for admissions. Joy also stated that her request for admission—Exhibit P-52—included a copy of the premarital agreement attached as "Exhibit A."

Joy testified that she believed that she and Jonathan "needed to have" a premarital agreement "in writing because of [her] financial situation going in[to]" the marriage and Jonathan's "lack of financial situation going into marriage." Before marriage, Joy "had an inheritance" and an individual retirement account, and

she owned a house in Austin, Texas. Her family had "highly encouraged" her to get a premarital agreement, so she consulted with an attorney.

Joy and Jonathan began their relationship about six months before they were married. A month or two before the wedding, Joy "initiated discussions" with Jonathan about entering into a premarital agreement. The attorneys that Joy had hired to draft the premarital agreement had it "ready to sign about a week before the wedding." Joy and Jonathan "printed [the premarital agreement] the morning of the rehearsal dinner, the day before" the wedding, and each of them brought a copy of the premarital agreement to a notary public at the customer service desk of a nearby grocery store to have it notarized. Joy signed her copy of the premarital agreement before the notary public, but Jonathan had "already signed" his copy of the premarital agreement before he arrived at the store. The notary refused to notarize Jonathan's copy of the premarital agreement because Jonathan had not brought his driver's license with him to the grocery store, "so he had no proof of identity," and because Jonathan's "initials on the bottom of each page" of the agreement were written in "different style[s]."

The next day was their wedding day, and Joy "couldn't figure out a way" to get the premarital agreement "notarized that day." As to the signed copies of the premarital agreement, Joy, "in the haste of the wedding," did "not remember what [she] did" with them.

After she filed her petition for divorce, Joy searched for the signed copies of the premarital agreement and contacted the attorneys who had drafted the agreement because she "had assumed" that "they had" the "signed copy." But Joy "couldn't find [the premarital agreement] in paper form." Joy believed that she "had a scanned copy" on Joy's and Jonathan's household computer, but she no longer had access to that computer because "Jonathan came into [their] house in the middle of the night and took" it.

According to Joy, Exhibit P-7, which the trial court admitted into evidence, was "an unsigned copy of the final version" of the premarital agreement that the attorneys "had sent [her and Jonathan] to get signed," and it was the same as the one that they had signed. Exhibit P-7 was the same document attached as "Exhibit A" to the request for admissions that Joy had served on Jonathan, which was admitted into evidence as Exhibit P-52.

Under the premarital agreement, Joy and Jonathan "represent[d] and warrant[ed]" to each other that "he or she ha[d], to the best of his or her ability, made to the other party a complete and accurate, fair, and reasonable disclosure of the nature and extent of the community property and the separate property of the parties, including values, and financial obligations," including but "not limited to the property and liabilities set forth" in Schedules A, B, C, and D attached to the premarital agreement.

Schedule A of the premarital agreement listed as Jonathan's separate property any future ownership by Jonathan in two parcels of real property located in Austin, one on Jamestown Drive and the other on Hartwick Place; a 2003 Dodge car; and all retirement funds "existing by reason of [Jonathan]'s past, present, or future employment," including an "Apple Inc. 401(k)" account and "all Apple Inc. stock owned prior to [the] date of marriage." Joy and Jonathan agreed that the properties listed on Schedule A, including "all mutations, changes, and increases in kind or value" of such property, "all income and revenues" from such property, and any inheritance "gifted to Jonathan on or after the date" that the parties executed the premarital agreement constituted Jonathan's separate property.

Schedule B of the premarital agreement listed as Joy's separate property "100% of any 401(k) savings account and all other benefits in [Joy]'s name," including a "GTECH 401(k) Retirement Savings Plan; "[a]ny and all interest in and balance of funds held" in Joy's name in certain "money market accounts, brokerage accounts, stocks, bonds, mutual funds, and securities, together with all dividends, splits, and other rights and privileges in connection therewith," including "[a]ll [a]ccounts with or associated with Independent Financial Resources, LLC." Also listed were a parcel of real property located on Justin Lane in Austin and a 2013 Cadillac car. Joy and Jonathan agreed that the properties listed in Schedule B of the premarital agreement constituted Joy's separate property, including "all mutations,

changes, and increases in kind or value" of such property, "all income and revenues" from such property, and any inheritance "gifted to Joy on or after the date" that the parties executed the premarital agreement.

The premarital agreement provided that "nothing" in it would "prevent either party from spending his or her separate property, listed on Schedules A and B, as he or she desire[d]." Schedules C and D of the premarital agreement listed certain specific "liabilities and obligations" that Jonathan and Joy agreed to have partitioned to each of them, respectively, as his or her "sole and separate property liabilities and obligations."

Jonathan "represent[ed] and warrant[ed]" in the premarital agreement that:

- he had been "fully and completely informed by [his] attorney" about the law relating to its subject matter "and about the spousal rights and liabilities of both parties";

- he was "entering into [the premarital agreement] voluntarily after receiving the advice" of his attorney;

- he "fully and completely underst[ood] each provision of [the premarital agreement], concerning both the subject matter and legal effect";

- the premarital agreement "was not procured by fraud, duress, or overreaching"; and

- he had investigated Joy's "property and financial obligations" "sufficiently to satisfy any questions" he had "in that regard."

Jonathan also "expressly waive[d] any right to disclosure of the property and financial obligations of [Joy] beyond the disclosures provided." And Joy made corresponding representations, warranties, and acknowledgements.

9

The parties expressed their intention that their "community expenses, including all living expenses," were to "be paid from community funds," but acknowledged that "[i]f community funds [we]re insufficient to pay an expense related to the community estate, then a spouse may have to use separate property funds to pay for the community estate's expenses and that spouse's separate property [would] be reimbursed."

Finally, Joy and Jonathan agreed in the premarital agreement that if their marriage was "dissol[ved] . . . by [c]ourt [o]rder," each would be awarded all his or her separate property as identified in the premarital agreement. Each also agreed "to release all interest or claims" he or she might have "in and to" the other's separate property and "relinquish[ed], disclaim[ed], and waive[d] all rights, title, and interest that he or she may have to seek a division of property and liabilities in a dissolution proceeding contrary to what [wa]s provided for" in the premarital agreement.

As to the characterization of property and the division of the community estate, Joy, at trial, relied on the testimony of Michael Benaglio, who holds a bachelor's degree in accounting and provides litigation support in "business valuation" and "[c]haracterization of [s]eparate/[c]ommunity [i]nterests involving [m]arital dissolution, [p]artnership [d]isputes," loan compliance, and personal property appraisal issues.

10

Benaglio performed two analyses, basing the first on an assumption that the premarital agreement was enforceable and the second on an assumption that it was not. Assuming that there was an enforceable premarital agreement, Benaglio explained that as of October 23, 2015—the date of the marriage—Joy held as her separate property assets in an "LPL Financial" account ending in "61." Joy's LPL Financial account statements showed that Independent Financial Resources, LLC, which was identified on Schedule B of the premarital agreement, used LPL Financial "to hold securities for their clients." Based on that information, Benaglio opined that "all funds held in LPL Financial" account ending in "61" (the "LPL account no. 61") were Joy's separate property.

Benaglio noted that the $100,000 from LPL account no. 61 used to purchase a home on August 15, 2016, during Joy and Jonathan's marriage, "created a 20.34% separate property interest" in the home for [Joy]." According to Benaglio, that home's sale on April 1, 2020 yielded $108,978.47 in separate property proceeds for Joy. Benaglio made similar analyses for a second property and a third property acquired by Joy and Jonathan during their marriage using funds from LPL account no. 61 for the down payments.

As to the Justin Lane property listed as Joy's separate property on Schedule B of the premarital agreement, Benaglio noted that Joy sold that home in October 2016, and on October 26, 2016, $98,199.65—the net proceeds from the sale—"were

wired into" a Bank of America account ending in "35." And, according to Benaglio, those "funds maintain[ed] the separate property character of the property that was sold."

As to the "GTECH 401(k) Retirement Savings Plan" listed as Joy's separate property in Schedule B of the premarital agreement, Benaglio noted that the retirement earnings from Joy's employment with GTECH was in an "IGT 401(k) [a]ccount." In 2019, "the entirety of [Joy's] IGT 401(k) account . . . was swept into" a Merrill Lynch account ending with "32" ("Merrill Lynch account no. 32"). Benaglio also noted that an account containing funds inherited by Joy in 2005 was also "rolled over" into the Merrill Lynch account no. 32. And, in November 2019, Joy transferred the funds in LPL account no. 61 to a Merrill Lynch account ending in "30" ("Merrill Lynch account no. 30"). And in December 2019, Joy transferred stock and cash from Merrill Lynch account no. 30 to a Merrill Lynch account ending in "29" ("Merrill Lynch account no. 29").

Based on his analysis, Benaglio opined that Joy's separate property included: (1) the proceeds from the sale of real property held in the escrow account,[4] (2) Merrill Lynch account no. 32, (3) Merrill Lynch account no. 30, and (4) Merrill Lynch account no. 29. Benaglio also concluded that Joy was entitled to various

---

[4]    An escrow account was established during the divorce proceedings to preserve assets received from the sale of properties that the parties had acquired during the marriage.

reimbursements for funds transferred from those accounts to community bank accounts and used to pay community debt.

Steve Pena, a certified public accountant, testified on behalf of Jonathan as to the property characterization and division. Pena opined that Benaglio did not use an accurate method to trace the parties' separate property. According to Pena, the "pro rata" method used by Benaglio was acceptable for "tracing dollars," but not assets, like the stocks held in certain accounts.

In reaching his conclusions, Pena "disregarded the [premarital agreement] . . . because it wasn't signed." Pena agreed with Benaglio, though, that Joy's retirement accounts and "the investment accounts from the LPL accounts that were transferred over into the Merrill Lynch accounts" were Joy's separate property. And Pena believed that the reimbursement claims were equitable, and thus, "a matter for the [trial court] to decide."

Jonathan testified that he was newly employed as a "customer onboarding specialist" with Orchard Brokerage, LLC. When Jonathan and Joy were first married, he was employed by Apple Inc. But when Joy became pregnant with their child, she asked him if he "could stay at home" and "take care of the responsibilities of the house" while she worked. So, Jonathan "left [his] job at Apple" and became a "stay-at-home dad" in July 2016. In addition to caring for their child, Jonathan did

13

the yard work, "did all the grocery runs," and took the cars to "get serviced." Jonathan was a stay-at-home dad "until [he] was served" with Joy's divorce petition.

When Jonathan was asked if he signed the premarital agreement, Joy's trial counsel objected on the grounds that Jonathan had "already admitted . . . that he did sign the [premarital] agreement, and that the [premarital agreement] that he signed [wa]s the same document" admitted into evidence as Exhibit P-7. The trial court overruled the objection. Jonathan then answered that the premarital agreement "that Joy had" was not the same premarital agreement "that he [had] signed." When he and Joy were negotiating the premarital agreement, Joy hired a separate attorney for Jonathan. Jonathan's attorney "told [him] not to sign" the premarital agreement drafted by Joy's lawyer because "it didn't cover [him]" and "didn't protect anything" for him if he and Joy were to divorce. Jonathan's attorney "sent a different version" of a premarital agreement, one that he did sign. That version "was supposed to be sent" to Joy's attorney, "but it got lost with the craziness of" the upcoming wedding. Jonathan "was told that" he and Joy "were going to get" a premarital agreement "after [they] had already sent" the wedding invitations. But Jonathan "didn't agree to it" and "didn't understand why [they] were" executing a premarital agreement "so last-minute."

According to Jonathan, he knew that Joy "had some money coming into the marriage" but "[s]he never disclosed all of what she had" to him. When he and Joy

14

were negotiating the premarital agreement, Jonathan understood the amount of money Joy had to be under $1 million. Jonathan understood that the community estate at the time of trial was "worth about $1.6 million," and he believed that a fifty-fifty division of the community estate would be just and right.

Jonathan also testified that sometime before he and Joy were married, Jonathan's father died. Jonathan's family had debts, including a property tax debt, and Jonathan "had responsibilities" to his family. Joy "offered to take care of th[o]se responsibilities" by paying the debts. Jonathan "did not need [Joy] to pay" those "debts right away." His family was "on payment plans" and was "doing fine." Yet Joy convinced Jonathan that they "were in a good financial situation" and could take care of his family's debts so they could go ahead and get married. So, Jonathan "hesitantly" agreed and accepted funds from Joy to pay his family's debts, even though he would have been "fine with waiting" to get married.

After trial, the trial court sent a letter informing the parties that it would "grant the divorce on the grounds of insupportability" and rendering various rulings, including a finding that "the parties did NOT have an enforceable pre-marital agreement at the time of the divorce."

In its final divorce decree, the trial court noted that the parties had agreed to the disposition of certain property. As to the contested property, the trial court awarded Joy $15,005.18 from the "community cash proceeds" held in the escrow

account and awarded Jonathan the remaining $259,069.00 in the escrow account. The trial court also awarded Jonathan all funds on deposit in three Bank of America accounts held by the community estate. And the trial court ordered each party to pay certain debts incurred by the community estate.

Joy timely filed a request for findings of fact and conclusions of law. When the trial court did not enter findings of fact and conclusions of law, Joy timely filed a request for past due findings of fact and conclusions of law. But the trial court made no findings of fact or conclusions of law.

## Premarital Agreement

In her first issue, Joy argues that the trial court erred in determining that the parties did not have an enforceable premarital agreement at the time of the divorce because "[t]he clear, unequivocal and credible evidence conclusively established that [she] and Jonathan signed a premarital agreement which was identical to the unsigned copy of the premarital agreement which was attached to [Joy's] request for admissions and admitted into evidence."

Most of the appealable issues in a family law case, including property division incident to divorce, are evaluated for an abuse of discretion. *Reddick v. Reddick*, 450 S.W.3d 182, 187 (Tex. App.—Houston [1st Dist.] 2014, no pet.); *Iliff v. Iliff*, 339 S.W.3d 126, 133 (Tex. App.—Austin 2009), *aff'd*, 339 S.W.3d 74 (Tex. 2011). A trial court abuses its discretion when it acts arbitrarily or unreasonably, or without

16

any reference to guiding rules and principles. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990). When reviewing matters committed to the trial court's discretion, we may not substitute our own judgment for that of the trial court. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). A trial court does not abuse its discretion merely because it decides a discretionary matter differently than an appellate court would in a similar circumstance. *Gray v. CHCA Bayshore L.P.*, 189 S.W.3d 855, 858 (Tex. App.—Houston [1st Dist.] 2006, no pet.). And as the factfinder in a bench trial, the trial court is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

In family law cases where we apply the abuse-of-discretion standard of review, legal and factual sufficiency of the evidence are not independent grounds for asserting error but are instead relevant factors in assessing whether the trial court abused its discretion. *Syed v. Masihuddin*, 521 S.W.3d 840, 847 (Tex. App.—Houston [1st Dist.] 2017, no pet.); *Coburn v. Moreland*, 433 S.W.3d 809, 823 (Tex. App.—Austin 2014, no pet.). In determining whether an abuse of discretion exists because the evidence is legally or factually insufficient to support the trial court's decision, we consider whether the trial court had sufficient information upon which to exercise its discretion and whether it erred in its application of that discretion. *Syed*, 521 S.W.3d at 847.

17

The Texas Family Code requires a premarital agreement to "be in writing and signed by both parties."  TEX. FAM. CODE ANN. § 4.002.  The Texas Family Code also provides that "[a] premarital agreement is not enforceable if the party against whom enforcement is requested proves that":

(1)     the party did not sign the agreement voluntarily; or

(2)     the agreement was unconscionable when it was signed and, before signing the agreement, that party:

> (A)     was not provided a fair and reasonable disclosure of the property or financial obligations of the other party;

> (B)     did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided; and

> (C)     did not have, or reasonably could not have had, adequate knowledge of the property or financial obligations of the other party.

*Id.* § 4.006(a).  Premarital agreements are generally interpreted like other contracts. *In re Marriage of I.C. & Q.C.*, 551 S.W.3d 119, 122 (Tex. 2018).

We first consider whether the parties executed a premarital agreement.  *See* TEX. FAM. CODE ANN. § 4.002.  In asserting that the trial court erred in concluding that Joy and Jonathan did not have an enforceable premarital agreement, Joy relies on Jonathan's response to her request for admissions, in which Jonathan admitted that he and Joy signed the premarital agreement attached as Exhibit A to her request for admissions, and her own uncontroverted testimony that Exhibit A, attached to her request for admissions, was an unsigned copy of the premarital agreement that

18

she signed the day before her and Jonathan's wedding. An unsigned copy of the same premarital agreement was also admitted into evidence.

The primary purpose of a request for admissions is to simplify trials by eliminating matters about which there is no real controversy. *In re Ferguson*, 445 S.W.3d 270, 275 (Tex. App.—Houston [1st Dist.] 2013, orig. proceeding); *see also Stelly v. Papania*, 927 S.W.2d 620, 622 (Tex. 1996). A matter admitted in response to a request for admissions is conclusively established as to the party who made the admission unless the trial court allows that party to withdraw or amend it. TEX. R. CIV. P. 198.3. Absent withdrawal or amendment, the admission, deemed or otherwise, is a judicial admission, and a party may not then introduce testimony to controvert it. *See Marshall v. Vise*, 767 S.W.2d 699, 700 (Tex. 1989); *USAA Cnty. Mut. Ins. Co. v. Cook*, 241 S.W.3d 93, 102 (Tex. App.—Houston [1st Dist.] 2007, no pet.); *see also Standard Fire Ins. Co. v. Morgan*, 745 S.W.2d 310, 312 (Tex. 1987) (deemed admissions create incontestable facts).

Here, Jonathan did not attempt to withdraw or amend his admission about his execution of the premarital agreement. Together with Joy's testimony that she signed the premarital agreement, Jonathan's admission that he signed the premarital agreement conclusively proves the existence of the premarital agreement. *See* TEX. FAM. CODE ANN. § 4.002 (premarital agreement must "be in writing and signed by both parties"). The trial court had no discretion to find otherwise.

We next consider whether the premarital agreement was enforceable. *See id.* § 4.006(a). The party opposing enforcement of the premarital agreement bears the burden to rebut the presumption of validity and establish the premarital agreement was not enforceable. *Marsh v. Marsh*, 949 S.W.2d 734, 739 (Tex. App.—Houston [14th Dist.] 1997, no pet.).

"[I]nvoluntary execution and unconscionability (coupled with inadequate disclosure of marital property information) are the only two defenses to marital property agreements that are specified in the [Texas Family Code]." *Sheshunoff v. Sheshunoff*, 172 S.W.3d 686, 689 (Tex. App.—Austin 2005, pet. denied) (applying Texas Family Code section 4.105 pertaining to partition or exchange agreements, which is otherwise identical to Texas Family Code section 4.006). As to whether Jonathan's execution of the premarital agreement was involuntary, Jonathan represented in the premarital agreement that he was "entering into [it] voluntarily after receiving the advice" of his attorney and that the premarital agreement "was not procured by fraud, duress, or overreaching." No evidence at trial countered this representation. The undisputed evidence thus conclusively established that Jonathan's execution of the premarital agreement was voluntary. *See* TEX. FAM. CODE ANN. § 4.006(a)(1).

As to whether the premarital agreement was unconscionable, we note that Jonathan did not raise unconscionability as an affirmative defense in either his

20

pleadings or at trial.  *See 950 Corbindale, L.P. v. Kotts Cap. Holdings Ltd. P'ship*, 316 S.W.3d 191, 196 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (allegation that contract is unconscionable must be affirmatively pled); *see also* TEX. R. CIV. P. 94 (requiring party to affirmatively plead any matter constituting avoidance or affirmative defense).  Further, in any event, the record precludes, as a matter of law, any conclusion that the premarital agreement was unenforceable under Texas Family Code section 4.006(a)(2)(A), (B), and (C).[5]

To satisfy that provision, Jonathan had to establish that the premarital agreement was unconscionable when it was signed and that he:

(A)    was not provided a fair and reasonable disclosure of the property or financial obligations of the other party;

(B)    did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided;  and

(C)    did not have, or reasonably could not have had, adequate knowledge of the property or financial obligations of the other party.

---

[5]    Our own authority indicates that whether the premarital agreement was unconscionable under Texas Family Code section 4.006(a)(1) should be determined before considering whether disclosure occurred or was waived under Texas Family Code section 4.006(a)(2).  *See Schwartz v. Schwartz*, No. 01-99-01365-CV, 2000 WL 1708518, at *3 (Tex. App.—Houston [1st Dist.] Nov. 16, 2000, no pet.) (not designated for publication); *accord In re A.M.H.*,  No. 14-17-00908-CV, 2019 WL 4419195, at *5 (Tex. App.—Houston [14th Dist.] Sept. 17, 2019, no pet.) (mem. op.).  The Austin Court of Appeals has not weighed in on that issue.  *See Sheshunoff v. Sheshunoff*, 172 S.W.3d 686, 689 (Tex. App.—Austin 2005, pet. denied).  We do not apply the analysis this Court adopted in *Schwartz* because this case was transferred here from the Austin Court of Appeals and it is unnecessary to reach the issue under the circumstances it presents.  *See* TEX. R. APP. P. 41.3, 47.1.

*See* TEX. FAM. CODE ANN. § 4.006(a)(2). Rather than advancing evidence to establish these required elements, Jonathan foreclosed the application of section 4.006(a)(2)(A), (B), and (C) through his admissions. In response to Joy's request for admissions, Jonathan admitted that the premarital agreement he signed "provided a fair and reasonable disclosure of the property and financial obligations of [Joy] prior to [his] signing the document." *See id.* § 4.006(a)(2)(A). Jonathan also admitted that he "voluntarily signed the waiver of any right to disclosure of the property and financial obligations of [Joy]." *See id.* § 4.006(a)(2)(B). And Jonathan warranted that he had investigated Joy's "property and financial obligations" "sufficiently to satisfy any questions" he had "in that regard." *See id.* §4.006(a)(2)(C). Jonathan did not seek to withdraw or amend these admissions.

For these reasons, we hold that the trial court erred in concluding that Joy and Jonathan did not have an enforceable premarital agreement at the time of their divorce.

We sustain Joy's first issue.

## Property Characterization and Division

In her second issue, Joy argues that the trial court erred in its characterization and valuation of the community and separate property in the final divorce decree because the trial court disregarded Benaglio's analysis and "treated all of the assets as community property."

Only community property is subject to division in a divorce. *Pearson v. Fillingim*, 332 S.W.3d 361, 363 (Tex. 2011). "Community property consists of the property, other than separate property, acquired by either spouse during marriage." TEX. FAM. CODE ANN. § 3.002. Separate property includes the property owned or claimed by the spouse before marriage, as well as property that the spouse acquired during marriage by gift, devise, or descent. TEX. CONST. art. XVI, § 15; TEX. FAM. CODE ANN. § 3.001. Separate property remains the property of its owner and is not subject to division. *Osborn v. Osborn*, 961 S.W.2d 408, 413–14 (Tex. App.— Houston [1st Dist.] 1997, pet. denied) (only community property is subject to "just and right" division and trial court may not divest party of separate property).

Property possessed by either spouse during or on dissolution of marriage is presumed to be community property and each spouse has the burden of proving by clear and convincing evidence that an asset is separate property. TEX. FAM. CODE ANN. § 3.003(a), (b); *Barnett v. Barnett*, 67 S.W.3d 107, 111 (Tex. 2001); *Stavinoha v. Stavinoha*, 126 S.W.3d 604, 607 (Tex. App.—Houston [14th Dist.] 2004, no pet.). Whether the property is separate or community property is determined by the facts that, as applied to the law, give character to the property. *Raymond v. Raymond*, 190 S.W.3d 77, 80 (Tex. App.—Houston [1st Dist.] 2005, no pet.).

Separate property can retain its character through a series of exchanges if the party asserting separate ownership overcomes the community-property presumption

by tracing the assets on hand during the marriage back to property that, because of its time and manner of acquisition, is separate in character. *Kelly v. Kelly*, 634 S.W.3d 335, 358 (Tex. App.—Houston [1st Dist.] 2021, no pet.); *Sink v. Sink*, 364 S.W.3d 340, 345 (Tex. App.—Dallas 2012, no pet.). Also, where the parties have entered into an enforceable premarital agreement, that agreement's terms dictate the separate or community character of the property it addresses. *See In re Marriage of I.C. & Q.C.*, 551 S.W.3d at 122 (Texas courts generally interpret premarital agreements like other written contracts). If the premarital agreement's terms are unambiguous, their meaning is a question of law for the court. *Id.*

Here, the premarital agreement listed specific property that was intended to remain the separate property of Joy and Jonathan, respectively. The evidence before the trial court showed that Joy used a substantial amount of her separate property funds to make down payments on properties acquired during the marriage, and the proceeds from the sale of those properties were in the escrow account. Yet most of the funds in the escrow account were awarded to Jonathan.

Because the trial court did not make findings of fact and conclusions of law as Joy requested, we cannot discern from the record whether the trial court's decision to award the bulk of the assets in the escrow account to Jonathan was affected by its erroneous ruling about the lack of an enforceable premarital agreement, a conclusion that Joy failed to satisfy her burden to prove her reimbursement claims by clear and

24

convincing evidence,[6] or some combination of both.[7]  If the trial court fails to file findings and conclusions in response to a proper and timely request, we must presume the trial court made all the findings necessary to support the judgment.  *Ad Villarai, L.L.C. v. Chan*, 519 S.W.3d 132, 135 (Tex. 2017).  But that presumption disappears and the failure to make findings is harmful if there are two or more possible grounds on which the trial court could have ruled and the appellant would have to guess at the reasons for the trial court's decision.  *Id.*; *Khechana v. El-Wakil*, 661 S.W.3d 425, 430 (Tex. App.—Houston [14th Dist.] 2023, no pet.); *Nicholas v. Envt'l Sys. (Int'l) Ltd.*, 499 S.W.3d 888, 894 (Tex. App.—Houston [14th Dist.] 2016, pet. denied).

When the trial court's failure to make findings is harmful, the appellate court generally directs the trial court to file the missing findings.  *See Ad Villarai*, 519 S.W.3d at 136; *see also* TEX. R. APP. P. 44.4 (requiring appellate courts to direct trial courts to correct any correctable error that prevents "the proper presentation of a case to the court of appeals").  Here, though we do not order the findings.  Because

---

[6]  *See, e.g.*, *Eichorn v. Eichorn*, No. 03-20-00382-CV, 2022 WL 1591709, at \*3 (Tex. App.—Austin May 20, 2022, no pet.) (mem. op.) (to rebut community presumption, burden of tracing separate property requires evidence over time about purported separate property funds used to make later purchase).

[7]  We note that the premarital agreement anticipated reimbursement of separate property funds used for community expenses, providing that "[i]f community funds are insufficient to pay an expense related to the community estate, then a spouse may have to use separate property funds to pay for the community estate's expenses and that spouse's separate property shall be reimbursed."

the trial court did not apply the parties' premarital agreement in characterizing the separate property, it did not properly distinguish between the parties' separate property and their community property. Thus, we remand the case for a just and right division of the properly characterized community property. *See Morris v. Veilleux*, No. 03-20-00385-CV, 2021 WL 4341967, at \*2 (Tex. App.—Austin Sept. 24, 2021, no pet.) (mem. op.) (appellate court must remand case if it finds error that materially affects trial court's just and right division of community property); *see also Jacobs v. Jacobs*, 687 S.W.2d 731, 733 (Tex. 1985) (remand for just and right division of community estate was necessary where appellate court found error in reimbursement claims that materially influenced community property division).[8]

We sustain Joy's second issue.

## Conclusion

We reverse the trial court's final divorce decree and remand the case to the trial court for further proceedings consistent with this opinion.

Julie Countiss
Justice

Panel consists of Chief Justice Adams and Justices Countiss and Rivas-Molloy.

---

[8] Because of our disposition of Joy's first and second issues, we need not address her remaining issues. *See* TEX. R. APP. P. 47.1.